**J. Paul and Patricia PRESEAULT and 985 Associates Ltd., Plaintiffs,**

**v.**

**The UNITED STATES and the State of Vermont, Defendants.**

No. 90–4043L.

United States Claims Court.

Jan. 8, 1992.

Patrick W. Hanifin, Boston, Mass., for plaintiffs.

Susan V. Cook, Washington, D.C., for defendant U.S. (Louis Mackall, I.C.C., of counsel).

Assistant Atty. Gen. John K. Dunleavy, Vermont Agency of Transp., for the State of Vt. (Charles H. Montange, of counsel).

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on cross-motions for partial summary judgment. Congress enacted the National Trails System Act, 16 U.S.C. §§ 1241–1251 (1988), which effected use of a former railroad right-of-way as a bicycle path. Plain-tiffs, who claim reversionary interests in the right-of-way, contend that the right-of-way consisted of railroad easements that had been abandoned and that consequently the Government took their property without just compensation under authority of the National Trails System Act. The court must determine the nature of the property interests held by plaintiffs and the extent that these are present interests rather than future interests under the law of Vermont.

## FACTS

The following facts are undisputed. Plaintiffs J. Paul and Patricia Preseault ("plaintiffs" or "the Preseaults")[1] own a fee simple interest in land near the shore of Lake Champlain in Burlington, Vermont. That land is shown as parcel A on the map below. The railroad right-of-way shown on the map by hatch marks is the subject of dispute of this litigation.[2] If the section of the right-of-way on the west side of parcel A were an easement, as plaintiffs have claimed, then parcel A would extend to the middle of the right of way as shown on the map. However, if this part of the right-of-way were a fee simple interest owned by defendant Vermont, as both defendants claim, then parcel A would extend only to the east ridge of the right-of-way.

1. "Plaintiffs" refers to all three plaintiffs, the Preseaults and 985 Associates, Ltd.

2. The term "right-of-way" is used throughout this opinion to denominate the tract(s) of land acquired by the railroad whether by deed or eminent domain. The term should not be construed to imply in every instance merely an easement.

The Preseaults are the sole general and limited partners of 985 Associates, Ltd. ("plaintiff 985 Associates"), a Vermont limited partnership with its principal place of business at 985 North Avenue, Burlington, Vermont. Plaintiff 985 Associates has received a quitclaim deed to the parcel shown on the map as parcel B. Parcel B is entirely within the right-of-way. Plaintiff 985 Associates also owns a fee simple interest in at least those parts of the "Manwell parcel," shown on the map, that lie outside of the railroad right-of-way. Plaintiffs assert that the part of the right-of-way across the Manwell parcel is an easement and that plaintiff 985 Associates owns the fee underlying the easement and the reversionary interest in the easement. However, defendants assert that Vermont owns the right-of-way across the former Manwell parcel in fee simple.

In 1898 the General Assembly of the State of Vermont chartered the Rutland–Canadian Railroad Company ("Rutland–Canadian Railroad"), a corporation organized under the laws of Vermont. An Act To Incorporate the Rutland–Canadian Railroad Company, 1898 Vt.Acts No. 160 ("the Charter"). Section 1 of the Charter stated that the Rutland–Canadian Railroad would

> have and enjoy the right of eminent domain and shall have full power to connect with, sell or lease to, or consolidate with, or to acquire by purchase or lease, and to operate any other railroad within or without this state, and may lay out, construct and maintain a railroad ... may build, erect and maintain suitable and convenient branches, buildings, stations, fixtures, machinery, sidetracks and terminal facilities, and other appurtenances ... may receive, take, hold, purchase, use and convey such real and per-

sonal estate as is necessary or proper in the judgment of such corporation, for the construction, maintenance and accommodation of such railroad ... as the purposes of the corporation may require.... Specifically, the General Assembly delegated to Rutland–Canadian Railroad the power to acquire a right-of-way to construct and operate a railroad connecting the City of Burlington, Vermont, with the town of Alburgh, Vermont. *Trustees of the Diocese of Vermont v. State of Vermont*, 145 Vt. 510, 511, 496 A.2d 151, 152 (1985).

In 1899 Rutland–Canadian Railroad exercised that power of eminent domain to acquire a railroad right-of-way across the land owned by the William H. Barker Estate. Since the Estate and Rutland–Canadian Railroad were unable to agree to a price for damages, the right-of-way was transferred to Rutland–Canadian Railroad by commissioner's award, which found "damage to the said owners of said land occasioned by such location, entry and occupation by the said Company [Rutland–Canadian Railroad] ... at the sum of four hundred & fifty dollars."

In 1899 Rutland–Canadian Railroad also acquired a right-of-way by warranty deed from Mr. and Mrs. Frederick Manwell. The deed stated that the Manwells, for the consideration of $80.00, "do give, grant, bargain, sell and confirm unto the said grantee [Rutland–Canadian Railroad] a certain piece or parcel of land lying and being in Burlington in the County of Chittenden and State of Vermont." The tract of land described is part of the railroad right-of-way in which plaintiffs claim a reversionary interest.

In 1920 Congress passed a series of amendments to the Interstate Commerce Act, which addressed, in part, the role of the Interstate Commerce Commission (the "ICC") in regulating the abandonment of railroad lines under its jurisdiction. The amendments state, in pertinent part:

(18) After ninety days after this paragraph takes effect ... no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit ... such abandonment.

(19) The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time prescribe, and the provisions of this Act shall apply to all such proceedings....

(20) The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby....

....

(21) The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation. Transportation Act of 1920, ch. 91, § 402, 41 Stat. 456, 477–78 (1920). In passing these amendments, Congress conferred plenary authority on the ICC to issue certificates of abandonment.

In 1962 the ICC authorized the successor to Rutland–Canadian Railroad, Rutland Railway Corporation, to abandon operations in Vermont, *Rutland Ry. Corp.— Abandonment of Entire Line*, 377 I.C.C. 393 (1962), subject to the line's acquisition

by the State of Vermont and continued service by its lessee, Vermont Railway, Inc. ("Vermont Railway"). *State of Vermont and Vermont Ry., Inc.—Acquisition and Operation in Vermont*, 320 I.C.C. 330 (1962). The State of Vermont received a quitclaim deed from Rutland Railway Corporation that conveyed whatever interest Rutland Railway Corporation had in the right-of-way.

In 1963 the General Assembly of the State of Vermont passed An Act Relating to the Rutland Railway Corporation, 1963 Vt.Acts No. 162. The Act provided, in pertinent part:

### Sec. 1. *Policy*

It is hereby declared to be the policy of the State of Vermont to preserve for continued railroad service, so much of the line of the Rutland railway corporation as may be feasible in the event of abandonment of such service by the Rutland railway corporation.

### Sec. 2. *Acquisition—necessity*

The public service board as agent for the state, with the approval of the governor, is authorized to acquire, by purchase or condemnation, . . . such portion or portions of the line of the Rutland railway corporation located within the State of Vermont, including tracks and ties, rights of way, land, buildings, appurtenances and other facilities necessary and required for the operation of railroad for the purpose of sale or lease thereof for continued operation of a railroad as may be desirable or necessary for such continued operation. The acquisition of such property is declared to be for a public purpose and to be reasonably necessary.
. . . .

### Sec. 4. *Sale or lease; purpose*

The public service board as agent for the state, with the approval of the governor, is authorized to sell, transfer or lease all or any part of property acquired under the provisions of this act, to any responsible person, firm or corporation, for continued operation of a railroad, or other public purpose, provided, if necessary, approval for such continued operation, or other public purpose, is granted

by the interstate commerce commission of the United States. . . .

Vermont leased the right-of-way to Vermont Railway, which operated trains on the right-of-way. *Trustees*, 145 Vt. at 511, 496 A.2d at 152. In 1966 the Preseaults purchased the former Manwell parcel, thereby acquiring whatever interest the Manwells retained in the right-of-way after executing the deed to Rutland–Canadian Railroad in 1899. In 1979 the Preseaults transferred their interest in the Manwell parcel to plaintiff 985 Associates.

In 1970 Vermont Railway ceased active transport operations on the line and used the line only to store railroad cars. In 1975 Vermont Railway removed all of the railroad equipment, including switches and tracks, from the portion of the right-of-way running over all of the parcels of plaintiffs' land and used the tracks elsewhere for emergency track repairs. At present, tracks on the right-of-way end approximately one mile south of the area in which plaintiffs claim reversionary rights. The ICC did not give approval to either the discontinuance of service or the removal of the tracks and equipment along the right-of-way. *Trustees*, 145 Vt. at 512, 515, 496 A.2d at 152, 154. The tracks and equipment have not been replaced. The two major structures on the rail line, "Bishop's Bridge" and the North Beach Highway Underpass, remain intact, as do all culverts and the railroad subgrade. The line also continues to be licensed, first from Rutland Railway Corporation and, in more recent years, from the State of Vermont and Vermont Railway, as the route of a major electrical transmission line owned and operated by the City of Burlington's electric department. It is technically feasible to restore the rail line at an approximate cost of $533,000.00.

In 1980 plaintiffs purchased parcel A, which had been part of the Barker Estate property. On January 17, 1990, Stuart and Margaret Ireland transferred parcel B, depicted on map, to plaintiff 985 Associates by quitclaim deed. On June 18, 1985, the State of Vermont Agency of Transportation, as lessor, joined by Vermont Railway

and the City of Burlington as lessee, entered into a lease by which Vermont purported to lease the right-of-way to the City of Burlington for use as a bicycle and pedestrian path. In 1990 the lease was renewed for five years.

In 1981 the Preseaults, who then owned parcels A and the Ireland parcel (including parcel B) in their individual capacities, and some of their neighbors brought a quiet title action in the Superior Court of Chittenden County, Vermont, captioned *Trustees of the Diocese of Vermont, et al. v. State of Vermont, Vermont Railway, Inc., and City of Burlington,* alleging that the right-of-way had been abandoned both in fact and under Vermont law and that therefore the easement for railroad purposes had reverted to them by operation of Vermont property law. The former Manwell parcel was not involved in the case. *Preseault v. ICC,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990); *Trustees,* 145 Vt. at 512, 496 A.2d at 152. In August 1983 the superior court dismissed the action, holding that it lacked subject matter jurisdiction because the ICC had not authorized abandonment of the route and therefore still exercised valid jurisdiction over it. *Trustees,* 145 Vt. at 512, 496 A.2d at 152. Plaintiffs appealed the dismissal of their claim. The Vermont Supreme Court affirmed the dismissal, holding that "courts are not empowered to make any determination regarding the issue of abandonment, as such would interfere with the ICC's plenary authority in this area." *Trustees,* 145 Vt. at 515, 496 A.2d at 154 (citations omitted).

On July 15, 1985, the Preseaults and several neighbors filed a petition with the ICC for a determination of exemption from the jurisdiction of the ICC and for a certificate of abandonment of the rail line. The State of Vermont intervened in the ICC action and petitioned the ICC to permit Vermont Railway to discontinue rail service and to transfer the right-of-way to the City of Burlington for use as a public trail under section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d) (1988) ("the National Trails Act"), an act establishing a nationwide system of nature and recreational trails. To comply with the ICC's procedural requirements, the State and Vermont Railway, the state's lessee, filed a Verified Notice of Exemption (Corrected) on December 16, 1985. In that document the State of Vermont and Vermont Railway certified that

> no local traffic has moved over the line for at least two years and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a State or local government entity acting on behalf of such a user) regarding cessation of service over the line either is pending with the Commission or any U.S. District Court or has been decided in favor of the complainant within the two year period.

By a Notice of Exemption decided January 2, 1986, the ICC allowed Vermont Railway to discontinue service and approved the agreement between the State of Vermont and the City of Burlington for interim trail use. The ICC's decision became effective on February 5, 1986. The Preseaults applied for a stay of this order, alleging that the exemption procedures failed to afford them the opportunity to present their case adequately. The Preseaults also made a request to rebut the State of Vermont's evidence.

The Preseaults' motion for reconsideration and/or clarification of the order was denied on July 17, 1987. *State of Vermont and Vermont Ry., Inc.—Discontinuance of Service Exemption—In Chittenden County, Vt.,* 3 I.C.C.2d 903 (1987). In its decision denying the requested relief, the ICC noted that the Preseaults had been afforded an opportunity to present evidence of their claim. Moreover, the ICC stated that there was no need for cross-examination or additional evidentiary proceedings since, at the time of the proceedings on the Notice of Exemption, no material facts were in dispute. The ICC also examined the Preseaults' claim that the railroad's removal of a portion of track effectively extinguished the railroad's easement over the Preseaults' property. The ICC was not persuaded by this rationale:

Indeed, the very purpose of the Out of Service Lines exemption was to lessen regulatory requirements for abandonment of lines over which there had been no service and no request for service for at least two years. If our jurisdiction could be terminated by de facto abandonment, then out of service lines could be abandoned without regulatory approval and the exemption would be unnecessary. Even if the track is physically removed, as here, neither the carrier's common carrier obligation or the agency's jurisdiction is terminated. The Commission can, and has on occasion, ordered carriers to restore such lines where there is a request for service.

3 I.C.C.2d at 905 (citations omitted).

In addition to reasserting its jurisdiction and prerogative to determine what constituted abandonment, the ICC addressed directly the legislative history of the National Trails Act. The ICC noted that Congress "intended by enactment of the Trails Act to preserve [the ICC's] jurisdiction to protect railroad rights-of-way from title claims such as those of the ... [plaintiffs]." 3 I.C.C.2d at 908. The ICC declared that "[i]nevitably, interim trail use will conflict with the reversionary rights of adjacent land owners, but that is the very purpose of the Trails Act...." *Id.* at 908. The National Trails Act reflected the specific intent of Congress, asserted the ICC, to preempt state property law, which might ordinarily require a reversion of rights-of-way when railroad operation is discontinued. *Id.*

The Preseaults appealed the ICC's decision to the United States Court of Appeals for the Second Circuit. *Preseault v. ICC,* 853 F.2d 145 (1988), *aff'd on other grounds,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). In its decision the Second Circuit addressed the two constitutional claims raised by the Preseaults: that the National Trails Act was not a valid exercise of congressional Commerce Clause power and that the National Trails Act was facially violative of the Takings Clause of the fifth amendment to the U.S. Constitution.

As to the Preseaults' Commerce Clause claim, the court noted that under the requisite rational basis analysis, the challenged section of the National Trails Act served two purposes: (1) the preservation of rail corridors for renewed railroad use and (2) the public recreational use of trails. 853 F.2d at 150. Concluding that the National Trails Act seemed "a remarkably efficient and sensible way" to further both goals, the court held that the National Trails Act was a valid exercise of Congress' power over interstate commerce.

The court also rejected the Preseaults' fifth amendment claim that the National Trails Act constitutes a taking without just compensation. The court reaffirmed the ICC's jurisdiction and plenary power to issue certificates of abandonment. Although the Preseaults and appellee differed on their view of their respective property interests, the court ruled that even if the railroad had only an easement and the Preseaults retained reversionary rights in the easement, those reversionary rights were not triggered until the easement was abandoned. Without an ICC certificate of abandonment, there could be no abandonment, no reversionary rights triggered, and therefore no taking. 853 F.2d at 150. Thus, the court affirmed the decision of the ICC. The Preseaults then petitioned the United States Supreme Court for a *writ of certiorari,* which was granted on April 24, 1989, 490 U.S. 1034, 109 S.Ct. 1929, 104 L.Ed.2d 401.

In a unanimous decision, the Supreme Court affirmed the decision of the court of appeals on other grounds. *Preseault v. ICC,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). The Court stated that it was unnecessary to evaluate the merits of plaintiffs' takings claim, holding that "even if the rails-to-trails statute gives rise to a taking, compensation is available to [plaintiffs] under the Tucker Act, and the requirements of the Fifth Amendment are satisfied...." 494 U.S. at 4–5, 110 S.Ct. at 918 (citation omitted). Until they had attempted to avail themselves of the remedy supplied by the Tucker Act, the Preseaults' taking claim was premature. *Id.* at 17, 110 S.Ct. at 924–25. Although the Court de-

clined to examine the property issues presented, the Court did affirm the Second Circuit's treatment of the Commerce Clause claim, holding that the National Trails Act was a valid exercise of congressional power under the Commerce Clause. *Id.* at 18, 110 S.Ct. at 925.

On December 26, 1990, plaintiffs filed a complaint in the Claims Court against the United States. Plaintiffs subsequently served a copy of the complaint on the State of Vermont, pursuant to RUSCC 14(a)(1). The State of Vermont entered its appearance as co-defendant on May 20, 1991. In their complaint plaintiffs ask this court to enter judgment against the United States and the State of Vermont for just compensation, plus interest, for the fair market value of the portion of plaintiffs' land which the United States has taken. Plaintiffs also ask this court to enter judgment against defendants for just compensation, plus interest, for the reduction in fair market value of portions of plaintiffs' land adjacent to the land taken by defendants. Finally, plaintiffs request an award of fees, costs, and any other relief, which this court deems proper, stemming from the alleged unlawful taking of plaintiffs' land.

## DISCUSSION

### I. *Nature of property interests held by plaintiffs*

The first issue to be resolved is the nature of the state property interests held by the parties. As Justice O'Connor noted in the concurring opinion to *Preseault v. ICC:*

[S]tate law creates and defines the scope of the reversionary or other real property interests affected by the ICC's action pursuant to Section 208 of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d). In determining whether a taking has occurred, "we are mindful of the basic axiom that '[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" [quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct.

2862, 2872, 81 L.Ed.2d 815 (1984), quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 450–51, 66 L.Ed.2d 358 (1980) (internal quotation omitted) ].

494 U.S. at 20, 110 S.Ct. at 926 (O'Connor, J., concurring).

Plaintiffs contend that the decision of the Vermont Supreme Court in *Trustees of the Diocese of Vermont v. State of Vermont,* 145 Vt. 510, 496 A.2d 151 (1985), demonstrates that the Vermont Supreme Court interprets plaintiffs' property interests to include reversionary rights in some of the parcels of land in question and interprets these parcels to have been conveyed as easements rather than as estates in fee. The court agrees with defendants that the *Trustees* decision is not dispositive on this issue. Plaintiffs in *Trustees* appealed the dismissal of their suit seeking a declaration that an easement had been abandoned and was extinguished. The superior court dismissed the action on the ground that the ICC's authority to regulate the question of abandonment of easements was plenary and essentially preempted Vermont law and the jurisdiction of Vermont courts. 145 Vt. at 511–12, 496 A.2d at 152–53. Although it is true that the factual recitation by the court in *Trustees* includes the statement that "the Rutland–Canadian Railroad Company obtained Commissioner's awards permitting the taking of an easement for railroad purposes...." 145 Vt. at 511, 496 A.2d at 152, this statement was not made to adjudicate the merits of the claim that an easement had been granted the railroad. Rather, the court was explaining why plaintiffs sought the declaration of extinguishment of an easement. Even construing the facts in the light most favorable to plaintiffs, and assuming, *arguendo,* that the railroad interests at issue in *Trustees* were not estates in fee, the court still was compelled to dismiss plaintiffs' action for lack of jurisdiction. Defendants in the instant case correctly note that there was no fact finding in *Trustees.* The court was not required to determine the nature of plaintiffs' property interests. Instead, it proceeded directly to the question

of whether, assuming that plaintiffs had fairly described these interests, abandonment had occurred. The court properly determined that this question was not within its jurisdiction.

The issues litigated in *Trustees* are fundamentally different from that presented by the case at bar in one significant respect. Instead of asking for a declaration that their interests had been abandoned legally, as they had in *Trustees,* plaintiffs in the instant case ask that the Claims Court hold that the effect of federal law on their property interests amounts to a taking. Therefore, without relying on *Trustees,* the court begins anew on the question of what property interests were conveyed under Vermont law by plaintiffs' predecessors in interest. Because the parcels of land were conveyed or acquired through different means, the court will address these conveyances individually to determine what rights, if any, plaintiffs have in the right-of-way.

■ 1. The least controversial conveyance among the various parcels pertains to the parcel of land taken by commissioner's award from the Barker Estate. Defendants challenge plaintiffs' interest in this parcel by asserting that the right-of way is "tantamount to a fee," Govt's Br. filed Aug. 30, 1991, at 22, and that possession of the right-of-way is much akin to ownership in fee. *See* Vt's Br. filed Sept. 12, 1991, at 5. Defendants also argue that the Vermont statute governing a railroad's use of eminent domain powers alludes to a railroad as being "seized and possessed" of land it acquires through the eminent domain proceeding and commissioner's award. Vt.Stat. (1894) § 3819. These terms, defendants assert, are terms applying only to acquisition of land in fee simple.

Although it is clear that ownership of a perpetual easement may offer rights similar to those held by owners of fee simple, the property interest held by the railroad is not the same as a fee simple. Obviously, a railroad company must have exclusive access to its tracks and machinery. The ingress and egress of the general public, however, are limited by the nature of the use of the easement. The conveyance remains an easement, and either the grantor or his successors retains reversionary rights therein. Regarding defendants' argument that the term "seized and possessed" applies exclusively to a fee simple interest, the Vermont Supreme Court addressed this issue in *Quimby v. Vermont Central Railroad Co.,* 23 Vt. 387 (1851), explaining that the term "seized and possessed" applied to a railroad easement, which, although not an interest in fee, confers on the railroad an exclusive possession for its duration. As a result of acquiring an easement, the railroad is "seized and possessed of such an estate in the land as is necessary for its uses, a right of way." 23 Vt. at 393; *see also Rutland R.R. v. Chaffee,* 71 Vt. 84, 85–86, 42 A. 984 (1899). Thus, the term "seized and possessed" is not limited to interests in fee, but, rather, is used in "reference to all sorts of property ownership." *In re Peck's Estate,* 96 Vt. 183, 190, 118 A. 527 (1922).

The Vermont Supreme Court decisions in the late nineteenth century, holding that a railroad through condemnation can obtain only an easement and not a fee, are binding precedent.[3] In *Rutland Railroad Co. v. Chaffee,* the court held that a commissioner's award gives a railroad an easement. 71 Vt. at 85–86, 42 A. 984. Relying on *Quimby,* the court determined that an interest acquired through eminent domain is an easement rather than a fee simple. This rule has been followed well into this century. *Dessureau v. Maurice Memorials, Inc.,* 132 Vt. 350, 351, 318 A.2d 652, 654 (1974); *Dickerman v. Town of Pittsford,* 116 Vt. 563, 566, 80 A.2d 529, 532 (1951).

Defendants attempt to challenge this entire line of cases by asserting that they

---

**3.** *Troy & Boston R.R. v. Potter,* 42 Vt. 265, 274–75 (1869); *Hill v. Western Vt. R.R.,* 32 Vt. 68, 74–77 (1859); *Stacey v. Vermont Cent. R.R.,* 27 Vt. 39, 43 (1854); *Vermont Cent. R.R. v. Burlington,* 28 Vt. 193, 197–98 (1855); *Jackson v. Rutland &* *Burlington R.R.,* 25 Vt. 150 (1853); *Hurd v. Rutland & Burlington R.R.,* 25 Vt. 116, 121 (1853); *Quimby v. Vermont Cent. R.R.,* 23 Vt. 387, 393 (1851).

were decided improperly, because the decisions were based on the erroneous belief that the legislature constitutionally could not delegate to the railroad the authority to obtain a fee simple through condemnation. This argument is of little moment. The Vermont Supreme Court has interpreted the Vermont Constitution; this court has no authority to disturb that interpretation. The court does note, however, that none of the cases holding that a railroad can acquire through condemnation only an easement, and not a fee, has been reversed. Although defendants cite *Page v. Heineberg*, 40 Vt. 81 (1868), in order to demonstrate the deterioration of this rule, *Page* did not involve a railroad right-of-way taken by eminent domain. Additionally, as this court has already noted, the rule has continued well beyond *Page* and into this century.

The portion of the right-of-way consisting of the parcel of land condemned from the Barker Estate and taken by commissioner's award is indisputably an easement under the law of the State of Vermont. Plaintiffs, successors in interest to the Barker Estate's interest, retain reversionary rights in the fee underlying this easement.

■ 2. The Manwell parcel's conveyance presents greater difficulties. Both plaintiffs and defendants recognize that the parcel was conveyed by warranty deed, the language of which seems to have conveyed an estate in fee simple. The parties differ on their interpretation of how this deed should be construed. Plaintiffs argue that although the deed purports to grant fee simple, since the deed was given following survey and location of the railroad, it should be construed as conveying only an easement in accordance with Vermont law. Any conveyance of land following the initiation of eminent domain proceedings must be viewed as conveyance of an easement, plaintiffs claim, even though the parties arrived at a price for the land and the land was not conveyed through commissioner's award. Defendants counter that although survey and location of the railroad had occurred, no "formal" eminent domain pro-

ceedings had taken place; therefore, the railroad was entitled to receive the estate in fee. In short, defendants assert that the deed should be strictly construed as conveying fee simple. To support their divergent arguments, plaintiffs cite *Hill v. Western Vermont Railroad Co.*, 32 Vt. 68 (1859), as principal authority; defendants rely chiefly on *Page*.

In *Hill*, an ejectment action, the Western Vermont Railroad Company successfully fought an attempt by a creditor of the railroad to levy against both used and unused land acquired by the railroad in a contract of sale with an individual. After the contract price had been agreed upon and consideration paid, it was determined that the railroad did not require all the land purchased. Instead of permitting the creditor to levy against the unused land, the Vermont Supreme Court concluded that the railroad had acquired only an easement in the land and that the creditor could not levy against an easement. The unused or unnecessary land would simply revert to the original grantor.

In *Page* the Vermont Central Railroad Company acquired title to land by warranty deed. Subsequently, the railroad abandoned the land for railroad purposes when it changed the location of its roadbed. In an action for ejectment, the Vermont Supreme Court held that the land did not revert to the original grantor, and the land was deemed to be held in fee.

Although the facts of *Page* seem similar to the case at bar, plaintiffs argue persuasively that *Page* should be distinguished and urge this court to adopt the reasoning of *Hill*. As to the distinctions between *Page* and the instant case, plaintiffs argue that the most significant one is that the court in *Page* attributed the railroad's power to hold an estate in fee to a specific provision in its charter which expressly stated that the railroad could acquire real property by two different methods—

either by proceedings *in invitum,* or by grant and donation, making a plain distinction between the modes provided for that purpose. As to the latter mode of acquiring land for corporate purposes,

that is, to aid in the construction, maintenance and accommodation of the road, its language is "may take and hold all such grants and donations of land and real estate as may be made to the company." 40 Vt. at 86. The Rutland–Canadian Railroad Charter, by contrast, assert plaintiffs, did not confer a specific power to acquire real property by grant or donation, but, instead, limited the power to eminent domain. The charter declared that the railroad would

> have and enjoy the right of eminent domain and shall have full power to connect with, sell or lease to, or consolidate with, or to acquire by purchase or lease, and to operate any other railroad within or without this state, and may lay out, construct and maintain a railroad ... may build, erect and maintain suitable and convenient branches, buildings, stations, fixtures, machinery, sidetracks and terminal facilities, and other appurtenances ... may receive, take, hold, purchase, use and convey such real and personal estate as is necessary or proper in the judgment of such corporation, for the construction, maintenance and accommodation of such railroad ... as the purposes of the corporation may require....

1898 Vt.Acts No. 160, § 1. In contrast to *Page*, as well, plaintiffs assert that the Rutland–Canadian Railroad Charter included specific words of limitation—"as is necessary or proper"—limiting land acquisition to railroad use. The charter in *Page* includes no such delimiting language. Additionally, plaintiffs note that nothing in the *Page* decision indicates that the railroad was laid out pursuant to the statutory requirements for acquisition of railroad easements by eminent domain before the grantor executed the deed to settle a pending condemnation proceeding. This is precisely what occurred in the instant case.

Plaintiffs contend that *Hill*, which held that even a contract for sale of land conveys an easement, is applicable to the case at bar. Although the same court reached different results in *Page* and *Hill*, the two decisions can be reconciled. The commonality of the decisions is the charter language itself. In each instance it was necessary for the court to look at the charter governing the operation of the railroad to determine what specific powers were contemplated by the legislature in creating the railroad. While the charter at issue in *Page*, as plaintiffs correctly note, articulated powers of land acquisition both by eminent domain and by grant or donation, land acquisition in *Hill* was limited to what was "necessary for their public purposes," that is, an easement.

Although the charter of the Western Vermont Railroad Company is itself unavailable to this court, the court in *Hill* did summarize the applicable provisions of the charter at issue in that case:

> The charter of the Western Vermont Railroad Company provided that their directors might cause such examinations and surveys of the road to be made as they should deem necessary; and that the road, when so surveyed and the survey recorded, should be deemed the line on which the road was to be constructed; and that the corporation might enter upon and take possession of such lands as were necessary for the construction and maintenance of their railroad, and the requisite accommodations appertaining thereto, with a provision for the appraisal, by the commissioners, of the land so taken, if the parties should disagree as to the price.

32 Vt. at 70.

In construing the contract for the sale of land for railroad purposes, the *Hill* court held that the contract

> would not have bound the ... [seller] to convey more land than the company fairly required for their legitimate uses under their charter, or any greater estate in the land than such uses justly required. That is just what the company were empowered to take compulsorily. And their charter, as we think, was not intended to give them power to acquire any more land or any greater estate in such land, for the purposes of a road bed or stations, than was really requisite for such uses under their charter.

> ....

... In either mode of appropriating land for the purposes of the company, where they have by their charter the power to take it compulsorily, there is this implied limitation upon the power, that the company will take only so much land or estate therein as is necessary for their public purposes. It does not seem to us to make much difference in regard to either the quantity or the estate, whether the price is fixed by the commissioners or by the parties....

*Id.* at 74, 76.

The court in *Page* did not state that it was overruling *Hill* or any of the earlier precedents. Thus, while *Page* squarely stands for the proposition that a railroad may acquire real property by grant in fee simple, the language of the railroad's charter must expressly articulate that power. Where no articulation of such power exists, more than 100 years of well-settled Vermont law supports the presumption that a railroad may only take what is "necessary" to its purpose, namely, an easement.

That a railroad may not enjoy any power not specifically articulated in the railroad's charter is largely an argument of public policy. As Vermont Supreme Court Chief Justice Redfield wrote:

5. These grants being in derogation of common right are to receive a reasonably strict and guarded construction.... "In these cases it is always to be borne in mind that the acts of parliament are acts of sovereign and imperial power operating in the most harsh shape in which that power can be applied in civil matters—solicited as they are, by individuals, for the purpose of private speculation and individual benefit ...." [quoting *Glover v. North Staffordshire Ry.*, 5 Eng.L. & Eq.R. 335].

6. "These powers extend no further than expressly stated in the act, except where they are necessarily and properly acquired for the purposes which the act has sanctioned...." [quoting *Coleman v. The Easter Counties Ry.*, 4 Railw. C. 513, 524].

....

8. ... "It would present a singular spectacle, if while the courts of England are restraining within the strictest limits the spirit of monopoly and exclusive privilege in nature of monopoly, and confining corporations to the privileges plainly given to them in their charter, the courts of this country should be found enlarging these privileges by implication...." [quoting *Charles River Bridge v. Warren Bridge,* 11 Pet. (36 U.S.) 420, 546–47, 9 L.Ed. 773 (1837)]. "[T]he principle is recognized, that in grants by the public nothing passes by implication...." [quoting *United States v. Arrendondo,* 6 Pet. (31 U.S.) 691, 738, 8 L.Ed. 547 (1832)].

I. Redfield, *A Practical Treatise Upon the Law of Railways,* 116–17 (2d ed. 1858).

Assuming, *arguendo,* that the Rutland–Canadian Railroad Charter permitted the railroad to take land by eminent domain and by grant or donation, a question still remains as to the nature of a parcel conveyed by warranty deed following survey and location. Defendants argue that the deed should be strictly construed, as no "formal" eminent domain proceedings occurred. Although defendants do not specify what constitutes "formal" eminent domain proceedings, defendants imply that absent the commissioner's award proceeding, no eminent domain power has been executed. Thus, under the defendants' rationale, if the landowner settles on a price for an interest in his land with the railroad following survey and location, but prior to and without a commissioner's award, the land has not been taken through eminent domain. The court cannot accept this rationale.

The Vermont Supreme Court addressed the question of what constituted eminent domain in *Troy & Boston Railroad Co. v. Potter.* 42 Vt. 265 (1869). In *Troy* the court examined rival claims by a landowner and a railroad company in an action in trespass against the landowner. In doing so, it was necessary for the court to study how the land was conveyed by the landowner to the railroad company. As in the instant case, the land was not conveyed by commissioner's award, but, rather, a purchase price was agreed upon by the parties.

Although the defendant landowner attempted to address conditions that he had placed on the sale of the land as a defense to the trespass action, the court found that he had no right to impose conditions on the sale because the land had been taken, notwithstanding an agreed-upon price:

> The Company did not take the land by purchase, in the ordinary acceptation of that term, but took it by survey and location, under and according to the power and authority conferred by their charter. There is no qualification or limitation in respect to what they take; the extent of the acquisition is determined only by the power to take, given by the act of incorporation. The defendant had no power to impose restrictions, or make reservations. When the Company had so taken the land, they had obtained all the title to it they could acquire, subject to the payment of damages to the owner.

*Id.* at 273. Under *Troy*, still valid law in Vermont today, the lack of a commissioner's award proceeding was meaningless to the analysis of the land interest conveyed. Instead, the survey and location of the railroad constituted the taking of land. *Id.* at 272; *cf. Chesapeake & O. Ry. v. Deepwater Ry.*, 57 W.Va. 641, 50 S.E. 890, 894 (1905) ("Location of a railroad, within the legal definition of the terms, is a proceeding in the exercise of the power of eminent domain, amounting to an appropriation of the particular place selected for the site of the road...."); *Williams v. Odessa & M. Ry.*, 7 Del.Ch. 303, 44 A. 821, 836 (1895) ("The location of a railroad is not a mere right; it is an act. It is not the power to do a thing; it is the thing itself....").[4] The facts in *Troy* parallel the instant case. As in *Troy* the Manwell land was purchased by the Rutland–Canadian Railroad for an agreed-upon price following survey and location. Thus, under *Troy*, acquisition of the Manwell parcel by an agreed-upon price, following survey and location, is indistinguishable from an acquisition by commissioner's award.

4. By contrast, a mere survey would not constitute a taking by eminent domain. *See Williamsport & N.B.R.R. v. Philadelphia & E.R.R.*, 141 Pa. 407, 21 A. 645 (1891) (holding that preliminary survey not acted upon by railroad company would not constitute "location" of railroad line and not amount to compensable taking under eminent domain).

Under well-settled Vermont law, the property interests in the parcel taken by eminent domain through the commissioner's award, as well as those conveyed following survey and location by warranty deed, amounted to easements in which plaintiffs retained reversionary interests. Since it is concluded that plaintiffs retained reversionary interests in the easements held by the successors to the Rutland–Canadian Railroad, the second issue presented for summary judgment can be addressed—whether the reversionary interests have been triggered under Vermont law, or whether those interests remain future interests.

## II. *Abandonment of the easements*

■ Although the United States agreed that one of the first issues to be resolved in this case was the nature of plaintiffs' property interests under Vermont law, the United States, along with defendant Vermont, now urge this court to adopt the view that it is impossible to look at Vermont law on abandonment at the time plaintiffs' claim their reversionary interests were triggered. The reason, assert defendants, is that Vermont law on abandonments was inoperative after 1920 by virtue of the ICC's plenary authority governing abandonment of railroad lines. This court rejects that argument. Justice O'Connor wrote extensively on this issue in her concurring opinion in *Preseault v. ICC:*

> Although the Commission's actions may pre-empt the operation and effect of certain state laws, those actions do not displace state law as the traditional source of real property interests. See *Ruckelshaus*, 467 U.S. at 1003–004 [104 S.Ct. at 2873–74] (state law creates property right in trade secrets for purposes of Fifth Amendment, and regulatory regime does not pre-empt state property law.). The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay bur-

dens and defeats the property interest rather than suspends or defers the vesting of those property rights. See *National Wildlife Federation v. ICC*, 850 F.2d 694, 704–05 (D.C.App.1988). Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment. See *Ruckelshaus*, 467 U.S. at 1012 [104 S.Ct. at 2877] ("If Congress can 'pre-empt' state property law in the manner advocated by the EPA, then the Takings Clause has lost all vitality.").

494 U.S. at 22, 110 S.Ct. at 927. Justice O'Connor criticized the Second Circuit's reasoning in the case:

> The Court of Appeals for the Second Circuit adopted this unjustified interpretation of the effect of the ICC's exercise of federal power. The court concluded that even if petitioners held the reversionary interest they claim, no taking occurred because "no reversionary interest can or would vest" until the ICC determines that abandonment is appropriate. See 853 F.2d 145, 151 (1988). This view conflates the scope of the ICC's power with the existence of a compensable taking and threatens to read the Just Compensation Clause out of the Constitution. The ICC may possess the power to postpone enjoyment of reversionary interests, but the Fifth Amendment and well-established doctrine indicate that in certain circumstances the Government must compensate owners of those property interests when it exercises that power. See *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314–15 [107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250] (1987).... Indeed, if the Second Circuit's approach were adopted,

discussion of the availability of the Tucker Act remedy would be unnecessary.

494 U.S. at 23–24, 110 S.Ct. at 927–28. Defendants unsuccessfully urge this court to adopt the same flawed analysis as that of the Second Circuit.[5]

■ Under Vermont law the owner of a servient estate owns the fee underlying the servient estate and thus retains a reversionary interest in the railroad right-of-way, regardless of whether the property was taken through eminent domain or conveyed by deed. *Dessureau*, 132 Vt. at 351, 318 A.2d 652; *American Steel & Iron Co. v. Taft*, 109 Vt. 469, 472–73, 199 A. 261 (1938); *Troy*, 42 Vt. at 274; *Hill*, 32 Vt. at 77; *Stacey v. Vermont Cent. R.R.*, 27 Vt. 39, 43–44 (1854). In Vermont ordinarily the event that will cause the reversion of an easement for railroad purposes is abandonment of that easement. Acquisition of the easement by the railroad is "a right to use the land in a particular mode for a particular purpose and ... the estate would cease and the land revert, the moment it was put to any other use than the one designated in the charter or statute, by or under which the appropriation was made." *Hill*, 32 Vt. at 77; *see also Stacey*, 27 Vt. at 43–44 ("[I]f the land has once been taken, if the company for any period of time has been seized and possessed of the land.... the plaintiff would be entitled on the abandonment of that location, to the land free of any incumbrance...."). Plaintiffs assert that this is the rule followed in a number of other states, as well. *See, e.g., Lawson v. State*, 107 Wash.2d 444, 730 P.2d 1308, 1311 (1986); *McKinley v. Waterloo R.R.*, 368 N.W.2d 131, 133 (Iowa 1985); *Schnabel v. County of DuPage*, 101 Ill. App.3d 553, 57 Ill.Dec. 121, 428 N.E.2d 671, 675–76 (1981); *Pollnow v. State Dept. of Natural Resources*, 88 Wis.2d 350, 276 N.W.2d 738, 744 (1979).

*Lawson v. State*, 107 Wash.2d 444, 730 P.2d 1308 (1986) (change in use would give effect to reversionary interests); *McKinley v. Waterloo R.R.*, 368 N.W.2d 131, 133–36 (Iowa 1985) (lack of railway use triggered period leading to reversion); *Schnabel v. County of DuPage*, 101 Ill. App.3d 553, 57 Ill.Dec. 121, 428 N.E.2d 671 (1981) (easement lapsed).

**5.** State law has guided other courts addressing whether a railway right-of-way lapsed upon the conversion to trail use. *Compare State by Washington Wildlife Preservation, Inc. v. State*, 329 N.W.2d 543, 545–48 (Minn.) (trail use within original interest, thus reversionary rights have not matured), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3540, 77 L.Ed.2d 1390 (1983), *with*

Mere non-use of a railroad right-of-way is not sufficient under Vermont law to trigger reversionary interests. *Stevens v. MacRae*, 97 Vt. 76, 80, 122 A. 892 (1923). The Vermont Supreme Court has held that abandonment occurs only when there is a showing beyond mere non-use, that is, when other factors give rise to an inference that the right-of-way is being used for a purpose inconsistent with its being a railroad, or when there is clear and objective indication that there is no present intent on the part of the railroad to use its right-of-way. This court refers to the doctrine of factual abandonment as "non-use plus." In *Stacey* the Vermont Supreme Court held that a right-of-way had been abandoned when the line was rerouted and the original tracks were used on a new line. 27 Vt. at 43–44; *see also American Steel*, 109 Vt. at 473, 199 A. 261 (railroad that ceased to operate on right-of-way and that sold tracks and equipment to second railroad had abandoned right-of-way easement). Removal of tracks is one factor that transcends mere non-use and brings a railroad's actions within the non-use plus doctrine. If abandonment is found, it may date back to the date of removal of the tracks. *Proctor v. Cent. Vt. Pub. Serv. Corp.*, 116 Vt. 431, 433, 77 A.2d 828 (1951). Similarly, when the owner of an easement physically modifies the easement in such a way that the modification is inconsistent with the purpose for which the easement was granted, this, too, may bring the easement within the non-use plus doctrine. *Timney v. Worden*, 138 Vt. 444, 447–48, 417 A.2d 923 (1980) (construction of house across right-of-way for pedestrian traffic triggered abandonment of easement and reversion to grantor), *overruled in part on other grounds, Lague, Inc. v. Royea*, 152 Vt. 499, 568 A.2d 357 (1980).

Ordinarily, abandonment under Vermont law requires no authorization and occurs automatically under the doctrine of non-use plus. Plaintiffs assert that this principle of automatic abandonment requiring no judicial or administrative authoriza-

tion dates well back to *Hill*, in which the Vermont Supreme Court declared that an easement for railroad purposes "would cease and the land revert, the moment it was put to any other use than the one designated in the charter or statute, by or under which the appropriation was made." 32 Vt. at 77; *see also Dickerman v. Town of Pittsford*, 116 Vt. 563, 566, 80 A.2d 529 (1951) (relying on analogy to railroad easement in *American Steel*, court held determinable fee terminated when property was no longer utilized).

Plaintiffs argue that although the question of whether federal law preempted abandonment in the instant case has not been decided,[6] as a matter of Vermont law the railroad was abandoned. It is undisputed that by 1975 the tracks and equipment had been removed. This equipment was never replaced. The State of Vermont declared in 1985 in its Verified Notice of Exemption filed with the ICC that the right-of-way had not been used and that no one had challenged discontinuance of service. Vermont did not intend to relay the tracks when it made this representation to the ICC; rather, it sought retroactive approval for the 30–year bicycle path lease that it had entered into with the town of Burlington. Under Vermont law, as plaintiffs assert, it seems evident that the non-use plus doctrine has been satisfied.

Defendants raise a number of arguments to countervail plaintiffs' assertion that, under Vermont law, the railroad right-of-way was abandoned. The most significant of these arguments centers on the doctrine of shifting public use. Under the doctrine of shifting public use, when an easement is given for public use, such as a railroad, and then put to another similar use, no abandonment will be held to have occurred. The doctrine has been reviewed by a number of railroad scholars, including Edward L. Pierce, who discussed the shifting public use doctrine in his Treatise on the Law of Railroads:

6. The parties have agreed that the court will not decide the question of whether federal law preempted abandonment, but only whether, ap-

plying Vermont law alone, abandonment has occurred. The parties reserved the federal and constitutional issues for further briefing.

**Changes of Use, when a new Taking.—** The use of property taken by the right of eminent domain is not confined to the precise mode or kind of use which was in view at the time of the taking, but may extend to other modes which were then unpracticed and unknown. When property has been taken for a public use, and full compensation made for the fee or a perpetual easement, its subsequent appropriation to another public use—certainly if one of a like kind—does not require further compensation to the owner. Nor is such compensation required when there is a change in the person or body enjoying or controlling the property taken, or in the conditions upon which the public may use it. Accordingly, the adjoining owner is not deprived of any constitutional right when a highway is transferred to a private corporation charged with the duty of maintaining it and invested with the power of taking tolls, nor when a turnpike becomes free to public travel. There is no change of use involving a new taking when, under legislative authority, the location of a plank-road or canal is converted into that of a highway, or of a railroad.

. . . .

**A Railroad in a Highway not necessarily a Different Use.—**The purpose of opening a highway or street is, to provide the public with a right of passage for persons on foot or riding in carriages or other kinds of vehicles. The use for which this public right is obtained is not confined to the same species of vehicles, drawn by the same kind of power that prevailed at the time of the dedication or appropriation, but admits of the passage and repassage of such other vehicles, operated in such a mode and by such force as an advanced civilization may require. . . .

E.L. Pierce, *A Treatise on the Law of Railroads* 233, 234 (1881) (footnotes omitted).

Chief Justice Redfield also recognized the doctrine of shifting public use in a later 1888 edition of *The Law of Railroads:*

The mere possibility of reverter to the original owner, or his heirs or grantees, is not regarded . . . as any appreciable interest requiring to be compensated.

. . . The most the owner of the fee could claim in such case is to recover compensation for any additional land taken, and for any additional burden imposed upon the land appropriated . . . [beyond the original use], as well as for any additional damage to the adjoining lands of the same owner.

I.F. Redfield, *The Law of Railways* 269 (6th ed. 1888).

■ Ultimately, defendants' argument cannot succeed because the shifting public use doctrine is inapplicable to the facts of this case. The railroad tracks and equipment were removed in 1975, and it was not until some 10 years later that the State of Vermont sought to utilize the right-of-way for a different public use. By that date the easement had been extinguished under Vermont law. The doctrine of shifting public use, in order to be properly reconciled with Chief Justice Redfield's recognition of a railroad's limited powers of acquisition in *Hill,* must rest on the premise that a shifting public use will occur only when there is minimal disruption in continuity between one use and another. The doctrine cannot be used to justify some 10 years of non-use or to resurrect after 10 years an easement otherwise extinguished under Vermont law; nor can it be used thereby to revoke a grantor's properly triggered reversionary interest.

Additionally, the shifting public use doctrine seems to be premised on the public policy argument that allows an easement to expand its use based on unforeseen technology or new modes of transportation. The court is not persuaded by Vermont's contention that converting the railroad to a bicycle trail necessarily will effectuate the same result as converting it to a high-speed transit system under the shifting public use doctrine. Vermont also argues unconvincingly that bicycle and pedestrian traffic are of such a similar nature to railroad transportation that they fit entirely within the notion of shifting public use under the rubric of like-kind transportation. While

rail transportation provides large-scale transit for large numbers of people, the stated purpose of the interim trail use is to provide recreational trails along Lake Champlain.

By the same token, plaintiffs do not persuade this court that bicycle trail use would necessarily be a factor inconsistent with rail use that would trigger abandonment under the doctrine of non-use plus. Under the shifting public use doctrine, and assuming, *arguendo,* that trail use is considered another public use under the doctrine, had the railroad attempted to convert from railroad use to trail use soon after removing the tracks and equipment, it is possible that there would have been no abandonment and no reversionary interests triggered. No evidence has been offered, however, that, at the time the railroad removed the tracks and equipment from the right-of-way, it had contemplated any other use for the right-of-way. Defendants have not indicated that any other use was envisaged, proposed, or budgeted for, until Vermont actually leased the right-of-way to the City of Burlington approximately 10 years after operations on the railroad line ceased. The doctrine of shifting public use does not allow an owner of an easement to abandon the easement and then retake the easement at a later time by asserting a new public use. Shifting from a use, to a non-use, to a use again is not what the doctrine of shifting public use contemplates.

Defendants cite a seminal case supporting the proposition that public uses may be interchangeable. *Brainard v. Missiquoi Railroad Co.,* 48 Vt. 107 (1874), dealt with a situation where a plank road company had condemned and taken land for a plank road from an owner, paying the owner damages as a result. The defendant railroad subsequently located its railroad over land held by the plank road company, effectively taking the plank road company's franchise and the entire interest held by the plank road company in the land taken from the original owner. The original owner claimed that he was entitled to compensation for the new taking. The Vermont Supreme Court ruled otherwise.

By laying its road upon and over the plank road, the company took all the rights and interest that the plank road company had in and to the land and territory upon which said plank road was laid.... The railroad company, by virtue of its charter, had the same right to take the franchise of the plank road company, together with all the rights and interests that said plank road company had in and to the land over which the road had been constructed, that said railroad company had to take the property of any other party, making due compensation therefor.... the railroad company is under no obligation, either legal or equitable, to pay the plaintiff therefor a second time.

48 Vt. at 113–14.

Vermont cites *Brainard* to support the proposition that highway uses within the state of Vermont are interchangeable. *See* 1937–38 *Biennial Report of the Vermont Attorney General* 272, 273 ("A railroad is an improved highway, and property, taken for its use by authority of the legislature, is property taken for a public use, as much as if taken for any other highway."). The facts in *Brainard,* however, are markedly dissimilar to the facts in the instant case. First, the railroad company in *Brainard* had acquired not only land interests, but the entire franchise of the plank road company. Thus, it had in essence acquired the plank road company itself, and included with the acquisition were land interests. Even more important, though, is that nothing in the *Brainard* decision demonstrates a discontinuity of public use, unlike the instant case. Here there is no continuity, or direct shift, from one public use to another. Rather, there is a shift from use to non-use and after virtually a decade of non-use an attempt by the State of Vermont to use the right-of-way anew by leasing it to the City of Burlington.

*Brainard* also addressed the issue of additional compensation based on the immediate shift in use and held that additional compensation was not warranted, absent the showing of additional burden imposed by the shift in use. Plaintiffs in this case do not maintain that they are entitled to

additional compensation because of a new burden on the right-of-way. Instead, they seek compensation because, as they contend, federal law has burdened their reversionary interests in their land.

The court rules only on the applicability to the facts of this case, not on the vitality, of Vermont's shifting public use doctrine. Although defendants have asserted that shortly after the railroad tracks were removed, the general public began to use the right of way as a sort of path or trail, this fact is not dispositive on the issue of abandonment. Even assuming, *arguendo*, that this type of activity took place immediately following the cessation of railroad operations, it still does not bring the shifting public use doctrine into play. The only new public use permitted by the Vermont General Assembly would occur with the express approval of the ICC. 1963 Vt. Acts No. 162, § 4. Since Vermont ceased operations of the railroad in 1975, but did not seek approval of the ICC until 1985, defendants cannot point to any public use, within the meaning of the 1963 statute, during the 10–year interim period. Thus, the court need not decide whether a bicycle or pedestrian path is a type of highway or a use compatible with that of a railroad for the purpose of applying the shifting public use doctrine, because the facts establish that the railroad itself made no use whatsoever of the land in question for approximately 10 years.

Vermont also makes the argument that, under state law, rail corridors are preserved against claims of easement extinguishment and reversion so long as they are devoted to trail use and railbanking. 1988 Vt. Acts (1987 Adj.Sess.) No. 211, codified at Vt.Stat.Ann.Tit. 5, § 3401 (1988); 1982 Vt. Acts (1981 Adj.Sess.) No. 187, codified at Vt.Stat.Ann.Tit. 30, § 711 (1986). Vermont derides plaintiffs for advancing the simple argument in response that these Vermont statutes currently in operation were not in operation at the time of the abandonment of the railroad. Notwithstanding Vermont's assertion that by the time plaintiffs invoked ICC procedures the Vermont statutes were in place, plaintiffs' argument is entirely on point. The effect of ICC action on Vermont law is not considered in this opinion.

Applying only Vermont law, reversion occurs at the moment when a right-of-way is abandoned. Abandonment in this case occurred well before the promulgation of the Vermont statutes of 1982 and 1988 that preserve railroad easements for interim trail use and railbanking. Furthermore, plaintiffs are not estopped from arguing this point because they brought a quiet title action after the promulgation of the statutes. Since abandonment under Vermont law occurs automatically, as plaintiffs maintain, a quiet title action merely clarifies the record and is not a condition precedent to a determination that abandonment occurred. The statutes do not apply retroactively. "Laws enacted by the general assembly shall take effect on July 1 next following the date of their passage, unless it is otherwise specifically provided." 1 Vt.Stat.Ann. § 212; *see also McKinley*, 368 N.W.2d at 133 (since abandonment had occurred before statutory change, statute acted prospectively and did not prevent or reverse the abandonment).

In *Proctor v. Central Vermont Public Service Corp.*, 116 Vt. 431, 77 A.2d 828 (1951), the Vermont court addressed the question of whether the extinguishment of an easement for a railroad right of way also extinguished the easement taken for an electric utility line. In *Proctor* the railroad right-of-way at issue had not been used for railroad purposes for 25 years; the tracks had been removed 23 years earlier and had not been replaced. Before confronting the issue of the utility easement, the *Proctor* court discussed briefly the question of abandonment of the railroad easement, finding the following: "Removal of the tracks twenty-three years before this suit was brought, absence of tracks since their removal, and nonuser for railroad purposes for twenty-five consecutive years is conclusive that the tracks were abandoned for railroad uses not later than the time the tracks were removed...." 116 Vt. at 433, 77 A.2d 828. Both defendants urge this court to disregard *Proctor*, since the facts in *Proctor* reveal that the

**836**

railroad lines in question were electric lines, over which the ICC exercised no jurisdiction, in contrast to the railroad line at issue in the case at bar.

Defendants miss the importance of *Proctor* as it relates to the case at bar. To the best of this court's knowledge, *Proctor* is the most recent case which demonstrates the effect of Vermont law alone on the issue of railroad abandonment. Absent ICC jurisdiction, it is apparent that the Vermont judiciary, as late as 1951, would find abandonment based upon cessation of railroad operations and removal of the tracks for a period of time. *Proctor* has not been overruled. Vermont alleged in its answer that the existence of a utility power line running underneath the railroad right-of-way prevents abandonment of the easement, but Vermont was well advised not to press this issue here. The court in *Proctor* held that notwithstanding an electrical line running along a railroad's right-of-way, the easement for the right-of-way for railroad purposes could be extinguished independently from the utility easement. 116 Vt. at 434, 77 A.2d 828.

Although the 1963 Vermont statute gave the state the power to alter railroad use with ICC consent, 1963 Vt. Acts No. 162, § 4, the state did not seek this consent until 1985, well after Vermont Railway had abandoned the railroad and the easements were extinguished.

## CONCLUSION

As a matter of Vermont law, the conveyances of the real property were conveyances of easements and plaintiffs accordingly retained, as successors to the original grantors, reversionary rights in these easements. Under Vermont law these easements were abandoned and extinguished. Under *Proctor* those easements were extinguished not later than removal of the tracks and equipment from the line in 1975. The court expresses no view on whether federal law has preempted plaintiffs' reversionary rights to the estates in fee underlying the extinguished easements. The parties will address this issue in the next phase of briefing. Accordingly, plaintiffs' motion for partial summary judgment is granted and defendants' cross-motions for summary judgment are denied.

IT IS SO ORDERED.