J. Paul and Patricia PRESEAULT and 985 Associates Ltd., Plaintiffs,

v.

The UNITED STATES and the State of Vermont, Defendants.

No. 90–4043L.

United States Court of Federal Claims.

Nov. 10, 1992.

Patrick W. Hanifin, with whom was Stephen S. Ostrach, Boston, Mass., for plaintiffs. Richard A. Epstein, Chicago, Ill., of counsel.

Susan V. Cook, with whom was James E. Brookshire, Washington, D.C., for defendant U.S. Robert S. Burk, Henri F. Rush, Ellen D. Hanson, Evelyn G. Kitay, and Louis Mackall, I.C.C., Washington, D.C., of counsel. Attorney General Jeffrey L. Amestoy and Asst. Atty. Gen., John K. Dunleavy, Vermont Agency of Transp., Montpelier, Vt., for defendant the State of Vt. Charles H. Montange, Washington, D.C., of counsel.

Fritz R. Kahn, Washington, D.C., with whom were Robert W. Blanchette and John B. Norton, Amicus Curiae, for the Ass'n of American Railroads. Verner, Liipfert, Bernhard, McPherson and Hand, Chtd., Washington, D.C., of counsel.

1. *See Preseault v. United States,* 24 Cl.Ct. at 819–25.

2. "Plaintiffs" refers to all three plaintiffs, the Preseaults and 985 Associates, Ltd.

OPINION

NETTESHEIM, Judge.

This case is before the court after argument on cross-motions for partial summary judgment. Congress enacted the National Trails System Act, 16 U.S.C. §§ 1241–1251 (1988), which enabled use of a former railroad right-of-way as a bicycle path. Plaintiffs, who claim reversionary interests in the right-of-way, contend that the right-of-way consisted of railroad easements that had been abandoned and that, consequently, the Government took their property without just compensation under authority of the National Trails System Act. In its earlier opinion, *Preseault v. United States,* 24 Cl.Ct. 818 (1992) (opinion on partial motions for summary judgment), the court ruled on the nature of the property interests held by plaintiffs applying only Vermont common law, without giving federal law, or the relationship of state and federal law, any effect. *See Preseault v. ICC,* 494 U.S. 1, 22, 110 S.Ct. 914, 927, 108 L.Ed.2d 1 (1990) (O'Connor, J., concurring). The earlier opinion determined that absent any influence of federal law and applying Vermont common law alone, the property interests held by plaintiffs were present, rather than future, interests. This opinion examines the federal and constitutional issues involved in the case in order to ascertain what effect, if any, federal law, including the relationship of state and federal law, has had on plaintiffs' common law property interests.

FACTS

The following facts are undisputed.[1] Plaintiffs J. Paul and Patricia Preseault ("plaintiffs" or "the Preseaults")[2] own a fee simple interest in land near the shore of Lake Champlain in Burlington, Vermont. That land is shown as parcel A on the map below.[3] The railroad right-of-way shown on the map by hatch marks is the subject

3. This map differs from that reproduced in *Preseault,* 24 Cl.Ct. at 820, in that parcel B is more precisely designated as separate from the Ireland parcel.

of dispute of this litigation.[4] The Preseaults are the sole general and limited partners of 985 Associates, Ltd. ("plaintiff 985 Associates"), a Vermont limited partnership with its principal place of business at 985 North Avenue, Burlington, Vermont. Plaintiff 985 Associates has received a quitclaim deed to the parcel shown on the map as parcel B. Parcel B is entirely within the right-of-way. Plaintiff 985 Associates also owns a fee simple interest in those parts of the "Manwell parcel," shown on the map, that lie outside of the railroad right-of-way. This court ruled that the right-of-way across the Manwell parcel is an easement and that plaintiff 985 Associates owns the fee underlying the easement and the reversionary interest in the easement.

1. *The history of state legislation relating to jurisdiction of the state*

Since the advent of railroad transportation, Vermont purposefully has followed a policy consistent with that of federal transportation law. Initially the conduct of railroads was controlled largely through provisions in their charters that specified the manner of service desired by the State. The charters licensed the railroads to serve certain cities and routes. In addition, the charters generally prohibited railroads

---

**4.** The term "right-of-way" is used throughout this opinion to denominate the tract(s) of land acquired by the railroad whether by deed or eminent domain. The term should not be construed to imply in every instance merely an easement.

from terminating service to any point or abandoning any lines. Determinations of public convenience and necessity were made at the time the charters were created.

In 1886 the State of Vermont created a Board of Railroad Commissioners. 1886 Vt. Acts No. 23. The Board exercised broad powers of general supervision of all railroads in the state operated by steam power. *Id.* § 5. The act creating the Board specifically noted:

> If at any time hereafter the Congress of the United States shall pass any acts upon the subject of inter-state commerce, or appoint commissioners to make regulations upon that subject, the railroad commissioners appointed under this act shall, as far as consistent with the laws of this State, conform to the laws of the general government, and the recommendations of the national board upon the subject of ... said acts and recommendations.

*Id.* § 12. As early as 1886, Vermont recognized the need for a consistent national railroad policy and patterned its own laws in conformance with the federal regulatory system that was commenced in 1887. The 1887 passage of the Interstate Commerce Act created the Interstate Commerce Commission (the "ICC"). Act of Feb. 4, 1887, Ch. 104, 24 Stat. 379 (1887).

Vermont's adherence to the federal system was exemplified in 1891 in *Fitzgerald & Co. v. Grand Trunk R.R.*, 63 Vt. 169, 22 A. 76 (1891). A party to a contract that antedated the Interstate Commerce Act sued to recover a rebate that it had been promised. The court refused to enforce a contract that now conflicted with provisions of the Interstate Commerce Act addressing rate discrimination. The court stated:

> There can in the nature of things be no vested right in an existing law which precludes its change or repeal, nor vested right in the omission to legislate upon a particular subject, which exempts a contract from the effect of subsequent legislation upon its subject matter by competent legislative authority.

63 Vt. at 173–174, 22 A. 76. Thus, the court found that pre-Interstate Commerce Act contract expectations could no longer be enforced. *See, e.g., Thompson v. Texas M. Ry.*, 328 U.S. 134, 144, 66 S.Ct. 937, 944, 90 L.Ed. 1132 (1946).

In 1898 the General Assembly of the State of Vermont chartered the Rutland–Canadian Railroad Company ("Rutland–Canadian Railroad"), a corporation organized under the laws of Vermont. An Act To Incorporate the Rutland–Canadian Railroad Company, 1898 Vt. Acts No. 160 ("the Charter"). Section 1 of the Charter stated that the Rutland–Canadian Railroad would

> have and enjoy the right of eminent domain and shall have full power to connect with, sell or lease to, or consolidate with, or to acquire by purchase or lease, and to operate any other railroad within or without this state, and may lay out, construct and maintain a railroad ... may build, erect and maintain suitable and convenient branches, buildings, stations, fixtures, machinery, sidetracks and terminal facilities, and other appurtenances ... may receive, take, hold, purchase, use and convey such real and personal estate as is necessary or proper in the judgment of such corporation, for the construction, maintenance and accommodation of such railroad ... as the purposes of the corporation may require....

Specifically, the General Assembly delegated to Rutland–Canadian Railroad the power to acquire a right-of-way to construct and operate a railroad connecting the City of Burlington, Vermont, with the town of Alburgh, Vermont. *Trustees of the Diocese v. State*, 145 Vt. 510, 511, 496 A.2d 151, 152 (1985).

In 1899 Rutland–Canadian Railroad exercised that power of eminent domain to acquire a railroad right-of-way across the land owned by the William H. Barker Estate. Since the Estate and Rutland–Canadian Railroad were unable to agree to a price for damages, the right-of-way was transferred to Rutland–Canadian Railroad by commissioner's award, which found "damage to the said owners of said land occasioned by such location, entry and occupation by the said Company [Rutland–

Canadian Railroad] ... at the sum of four hundred & fifty dollars."

In 1899 Rutland–Canadian Railroad also acquired a right-of-way by warranty deed from Mr. and Mrs. Frederick Manwell. The deed stated that the Manwells, for the consideration of $80.00, "do give, grant, bargain, sell and confirm unto the said grantee [Rutland–Canadian Railroad] a certain piece or parcel of land lying and being in Burlington in the County of Chittenden and State of Vermont." The tract of land described is part of the railroad right-of-way in which plaintiffs claim a reversionary interest.

When the conveyances occurred in the instant case in 1899, the overriding federal regulation of railroads involved in interstate commerce already affected any expectation the owner of a Vermont reversionary interest could entertain as to when, and under what circumstances, his interest would vest. In Vermont expectations under common law had already begun to adjust to federal and state regulatory impacts. *See, e.g.,* 1900 Vt. Acts No. 153 § 4.

Prior to the Transportation Act of 1920, ch. 91, 41 Stat. 456, 474–99 (1920) (the "1920 Act"), the state legislature directly regulated major railroad transactions within the state. This regulation included the prohibition of reversions of railroad rights-of-way. *See, e.g.,* 1900 Vt. Acts No. 153 § 4. During this period of direct regulation, a railroad could not abandon selectively part of its franchise without the state's consent. *Town of Readsboro v. Hoosac Tunnel & W. R.R.,* 6 F.2d 733, 736 (2d Cir.1925).

The 1920 Transportation Act passed a series of amendments to the Interstate Commerce Act that addressed, in part, the role of the ICC in regulating the abandonment of railroad lines under its jurisdiction. With the passage of the Transportation Act, the state ceased applying common law principles to abandonment matters. Instead, railroads in Vermont looked to the ICC for the regulatory administration of railroad lines in interstate service. *See, e.g., West River R.R. Abandonment,* 212 I.C.C. 175 (1936); *Woodstock Ry. Aban-*

*donment,* 189 I.C.C. 19 (1932); *West River R.R. Operation,* 162 I.C.C. 517 (1930).

In 1962 the ICC authorized the successor to Rutland–Canadian Railroad, Rutland Railway Corporation ("Rutland Railway"), to abandon operations in Vermont, *Rutland Ry. Abandonment of Entire Line,* 317 I.C.C. 393 (1962), subject to the line's acquisition by the State of Vermont and continued service by its lessee, Vermont Railway, Inc. ("Vermont Railway"). *State Acquisition and Operation in Vermont,* 320 I.C.C. 330, 331 (1963). The State of Vermont received a quitclaim deed from Rutland Railway that conveyed whatever interest Rutland Railway Corporation had in the right-of-way.

In 1963 the General Assembly of the State of Vermont passed An Act Relating to Rutland Railway, 1963 Vt. Acts No. 162. The Act provided, in pertinent part:

**Sec. 1.** *Policy*

It is hereby declared to be the policy of the State of Vermont to preserve for continued railroad service, so much of the line of the Rutland railway corporation as may be feasible in the event of abandonment of such service by the Rutland railway corporation.

**Sec. 2.** *Acquisition—necessity*

The public service board as agent for the state, with the approval of the governor, is authorized to acquire, by purchase or condemnation, ... such portion or portions of the line of the Rutland railway corporation located within the State of Vermont, including such tracks and ties, rights of way, land, buildings, appurtenances and other facilities necessary and required for the operation of railroad for the purpose of sale or lease thereof for continued operation of a railroad as may be desirable or necessary for such continued operation. The acquisition of such property is declared to be for a public purpose and to be reasonably necessary.

. . . .

**Sec. 4.** *Sale or lease; purpose*

The public service board as agent for the state, with the approval of the governor, is authorized to sell, transfer or lease all or any part of property acquired

under the provisions of this act, to any responsible person, firm or corporation, for continued operation of a railroad, or other public purpose, provided, if necessary, approval for such continued operation, or other public purpose, is granted by the interstate commerce commission of the United States....

Vermont leased the right-of-way to Vermont Railway, which operated trains on the right-of-way. *Trustees,* 145 Vt. at 511, 496 A.2d at 152. In 1970 Vermont Railway ceased active transport operations on the line and used the line only to store railroad cars. In 1975 Vermont Railway removed all of the railroad equipment, including switches and tracks, from the portion of the right-of-way running over all of the parcels of plaintiffs' land and used the tracks elsewhere for emergency track repairs. At present tracks on the right-of-way end approximately one mile south of the area in which plaintiffs claim reversionary rights. The ICC did not give approval to either the discontinuance of service or the removal of the tracks and equipment along the right-of-way. *Trustees,* 145 Vt. at 512, 515, 496 A.2d at 152, 154. The tracks and equipment have not been replaced. The two major structures on the rail line, "Bishop's Bridge" and the North Beach Highway Underpass, remain intact, as do all culverts and the railroad subgrade. The line also continues to be licensed, first from Rutland Railway and, in more recent years, from the State of Vermont and Vermont Railway, as the route of a major electrical transmission line owned and operated by the City of Burlington's electric department. It is technically feasible to restore the rail line at an approximate cost of $533,000.00.

## 2. *The history of federal legislation relating to jurisdiction of the ICC*

The ICC was created in 1887 for the purpose of regulating the nation's railroads in the public interest. S.Rep. No. 94–499, 94th Cong.2d Sess. 1, 10 (1976), 1976 U.S.Code Cong. & Admin.News 14, 24. The ICC conferred broad powers over rail carriers engaged in interstate commerce, including the power to oversee and adjust rates for these carriers. Various amendments to the Interstate Commerce Act have expanded and redefined the role of the ICC. During World War I, President Wilson provided by proclamation for the transfer of the responsibility for operation of the railroads to the United States Railroad Administration. Proclamation of December 26, 1917, 40 Stat. 1733 (1917). The United States Railroad Administration remained in control of railroad operations until March 1, 1920, when railroad operations were transferred again to private operation. At that time Congress expanded again the jurisdiction of the ICC with passage of the Transportation Act of 1920.

The amendments to the 1920 Act state, in pertinent part:

(18) After ninety days after this paragraph takes effect ... no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit ... such abandonment.

(19) The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time prescribe, and the provisions of this Act shall apply to all such proceedings....

(20) The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed

with the construction, operation, or abandonment covered thereby....

....

(22) The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation.

Transportation Act of 1920, Ch. 91, § 402, 1(18)–(20), (22), 41 Stat. 456, 477–78 (1920). The new provision that established the ICC's approval over abandonment, construction, and operation of railroad lines was added in order to resolve the frequent conflict between state laws and the federal regulatory scheme. The Supreme Court noted in *Transit Commission v. United States*, 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075 (1933), that

often the enforcement of state measures interfered with, burdened and destroyed interstate commerce. Multiple control in respect of matters affecting such transportation has been found detrimental to the public interest as well as to the carriers.

289 U.S. at 127, 53 S.Ct. at 538.

█ Under the Transportation Act of 1920, a rail carrier cannot be relieved of its legal common carrier obligation to provide rail service without first obtaining permission from the ICC. Section 402, 1(18)–(20), now 49 U.S.C. § 10903. (The abandonment and discontinuance provisions of the Transportation Act of 1920 were recodified in 1978 without substantive change by Pub.L. No. 95–473, 92 Stat. 1402.) In making its determination, the ICC considers the need of the shippers and communities for the line against the burden the line imposes on the carrier and interstate commerce. *See* 49 C.F.R. § 1152 (1987); *Colorado v. United States*, 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926). Without the abandonment or discontinuance authorization by the ICC, the carrier remains obligated as a common carrier to provide ser-

vice upon reasonable request, and a failure to provide service may be enjoined. *Thompson*, 328 U.S. at 147, 66 S.Ct. at 945; *ICC v. Chicago & N.W. Transp. Co.*, 533 F.2d 1025, 1028 (8th Cir.1976). Courts consistently have found that section 10903 gives the ICC plenary and exclusive authority over the abandonment and discontinuance of rail service. *Chicago & N.W. Transp. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 320, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981). In general, once a rail carrier makes a ICC authorized abandonment, that line is no longer part of the national transportation system. ICC jurisdiction is terminated unless it has imposed conditions on the abandonment. *Preseault v. ICC*, 494 U.S. at 5–6 n. 3, 110 S.Ct. at 919 n. 3. Even where a railroad has secured ICC authorization to abandon, that abandonment is not effective until the railroad has taken further steps to give effect to the authorization. *Hayfield N.R.R. v. Chicago & N.W. Transp.*, 467 U.S. 622, 633 n. 10, 104 S.Ct. 2610, 2617 n. 10, 81 L.Ed.2d 527 (1984); *Black v. ICC*, 762 F.2d 106, 112 (D.C.Cir.1985); *Kansas City Pub. Serv. Freight Operation—Exemption—Abandonment in Jackson Cty., Mo.*, 7 I.C.C.2d 216, 225 (1990).

█ The ICC authorization to abandon requirement does not mean that a railroad carrier arbitrarily can prevent other uses of the property. In fact, any person who demonstrates a "proper interest" in an abandonment proposal may seek the issuance of a certificate of public convenience and necessity authorizing the abandonment of the rail line. *Thompson*, 328 U.S. at 145, 66 S.Ct. at 944; *Modern Handcraft, Inc.—Abandonment in Jackson Cty., Mo.*, 363 I.C.C. 969, 971 (1981). An adjacent landowner claiming a reversionary interest in abandoned railroad property is one who could establish such a "proper interest." *Id.*

█ While abandonment authorization terminates ICC jurisdiction over a line, should the ICC choose to retain the line for possible future rail use, it may grant discontinuance authority. The authority to provide for discontinuance of railroad lines

has been recognized for many years. *See Smith v. Hoboken R.R.*, 328 U.S. 123, 130, 66 S.Ct. 947, 951, 90 L.Ed. 1123 (1946). Instances may occur, as well, when, although no shippers are requesting rail service on a particular line, a rail carrier does not desire to abandon the line and would prefer, instead, to await further needs for service. A rail carrier may, therefore, remove rails and ties, even permit the line to fall into disrepair, provided that it repairs the line and restores service should there be a request for service. The ICC's discontinuance authority permits a railroad to cease operations of a line for an indefinite period, while retaining the property under ICC jurisdiction and preserving the rail corridor for the possible reactivation of service in the future. *Preseault v. ICC*, 494 U.S. at 5–6 n. 3, 110 S.Ct. at 919 n. 3.

■ Section 402, 1(20) of the 1920 Act conferred authority on the ICC to impose conditions on rails affecting post-abandonment use of rail properties. The ICC enjoys the same long-standing authority today. 49 U.S.C. § 10903(b)(1)(A)(ii); *see also Abandonment of Part of Branch by Penn. R.R.*, 131 I.C.C. 547 (1927). It is also possible for a financially responsible person to offer to either subsidize or purchase a carrier line. *Hayfield N.R.R.*, 467 U.S. at 629, 104 S.Ct. at 2615. The ICC will set the price and other conditions for the transaction should the party and the rail carrier not be able to agree on the terms for conveyance of the railroad.[5] Under 49 U.S.C. § 10906, in the event that the ICC grants a petition for abandonment or discontinuance, it must make the further determination if rail properties

> are suitable for use for [other] public purposes, including highways, other forms of mass transportation, conservation, energy production or transmission, or recreation. . . .

If the ICC determines that one of these other purposes is viable, the ICC has the authority to offer the rail property for sale on reasonable terms for one of these public purposes. The ICC is authorized to hold up the property for up to 180 days after the decision authorizing abandonment.

### 3. Congressional efforts to preserve railroad rights-of-way and promote trail conversion

Congress has long been concerned with the loss of rail corridors as an important public resource. It also has an established concern with recreational trails. In order to meet the increasing needs of the public for recreation and access to natural and historical resources, Congress passed the National Trails System Act of 1968, 16 U.S.C. §§ 1241–1251 (1988) (the "National Trails Act"), which established a nationwide system of nature and recreational trails. The National Trails Act emphasizes providing trails with access to urban and scenic areas. 16 U.S.C. § 1241(a). To aid in the administration of the National Trails Act, this national system of trails utilizes nonprofit organizations and other volunteers in planning, development, maintenance, and management of trails. 16 U.S.C. § 1250. In addition, the National Trails Act promotes the development of trails at the state and local level. The Secretary of the Interior exercises the primary responsibility "to encourage States, political subdivisions, and private interests, including nonprofit organizations, to establish such trails." 16 U.S.C. § 1247(a). The Secretary of Housing and Urban Development and the Secretary of Agriculture also have responsibilities to encourage the creation of trails. 16 U.S.C. § 1247(b)–(c).

On January 2, 1974, the Regional Rail Reorganization Act of 1973, Pub.L. No. 93–236, 87 Stat. 985 (codified at 45 U.S.C. §§ 701–797m (1976)) (the "3–R Act"), was signed into law, providing for the creation of the United States Railway Association and the Consolidated Rail Corporation. In what was the most comprehensive effort ever attempted by the Federal Government to rescue and reorganize a key sector of the economy, Congress enacted the 3–R Act to preserve and revive financially disabled railroads in the Northeast and Midwest. The United Railway Association planned and financed the replacement of

---

5. Although the offeror may decline to accept the terms, the rail carrier shall be bound by them.

seven insolvent Class I railroads in the Northeast and Midwest. The Consolidated Rail Corporation was created as the principal new rail carrier in the region to operate the system. The 3–R Act required that these new rail systems, including the remaining solvent railroads in the region, were to be privately owned and operated. The rail systems were to be economically self-sustaining and able to provide competition and adequate and efficient rail service to meet the public convenience and necessity in the region and throughout the nation. 1976 U.S.Code Cong. & Admin.News, *supra*, at 40.

In 1976 Congress followed with the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 (codified as amended at scattered sections of 5, 11, 15, 31, 45, 49 U.S.C.) (the "4–R Act"), a subsequent attempt to preserve and reinvigorate the nation's railroads. The 4–R Act was enacted

> to promote the revitalization of the railroad industry in the United States ... to remedy the major problems of the railroads: an outmoded regulatory system; inadequate financial resources to improve and modernize rail facilities; inefficient use of present rail facilities; the need to improve intercity passenger transportation in the Northeast corridor; and the lack of a national transportation program to coordinate federal and state government efforts to develop and improve all transportation sources.

1976 U.S.Code Cong. & Admin.News, *supra*, at 15. "The primary focus of railroad regulation has been upon the pricing of services, industry structure, and entry into and the exit from the railroad markets." *Id.* at 24.

Under Section 809(a)(2) of the 4–R Act, Congress directed the Secretary of Transportation to prepare a report that would evaluate "the advantages of establishing a rail bank consisting of selected [abandoned railroad] rights-of-way" and discuss "interim uses for such rights-of-way." 90 Stat. 145. In the ensuing report, the Secretary documented the validity of Congress' concern. United States Department of Trans-

portation, *Availability and Use of Abandoned Railroad Rights–of–Way* (1977) (the "*Report*"). In the previous seven years, rail carriers had either abandoned or had pending to abandon 21,000 miles of railroad track in the continental United States. *Report* at 3. The American Association of Railroads estimated that the nation's remaining 200,000 miles of track would be reduced by a further 20 percent over the next decade. *Id.* The Secretary concluded that abandoned railroad rights-of-way constituted a "significant problem" while at the same time an "opportunity." *Id.*

Under the 4–R Act, Congress also enacted substantive measures to alleviate the problem. Section 803 (codified at 49 U.S.C.App. § 1654(f)–(o)), directed the Secretary of Transportation to provide financial assistance to states for freight assistance programs designed to cover the continuation of rail service, the purchase of rail lines to maintain existing or provide for future rail service, the rehabilitation and improvement of rail lines, and the cost of reducing the cost of lost rail service in a manner less expensive than continuing rail service. Section 810 directed the Secretary of Transportation to establish a federal rail bank for the purpose of preserving existing service to areas in which fossil fuel natural resources or agricultural production are located. Section 809(b)(3) directed the Secretary of the Interior to provide financial assistance to all governmental entities "for programs involving the conversion of abandoned railroad rights-of-way to recreation and conservational uses...." The enumerated uses specifically included national trails. § 809(b)(3), 90 Stat. 145; *see* note following 49 U.S.C. § 10906 (1982 ed.). Section 809(c) (codified at 49 U.S.C. § 10906), authorized the ICC to delay the disposition of rail property for up to 180 days after the effective date of an order permitting abandonment, unless the property had first been offered for sale on reasonable terms for public uses, including recreational use.

The 4–R Act repealed the abandonment and discontinuance provisions contained in sections 1(18)–(22) of the Interstate Commerce Act and provided a new abandon-

ment and discontinuance procedure in new section 1a. That section was to apply to railroads other than the northeastern railroads, which remain subject to the abandonment and discontinuance provisions of the 1973 Act, as amended by the 4–R Act. New section 1a established a procedure for ICC consideration of an application by a railroad for a certificate of abandonment or discontinuance. The ICC first decides whether the proposed abandonment or discontinuance is in the public interest. Upon a determination that it is, the ICC issues a certificate of abandonment or discontinuance, unless it finds that a financially responsible person has made an offer of financial assistance to enable the service to be continued. If it finds such an offer has been made, the ICC is to postpone issuance of the certificate for "a reasonable time, not to exceed six months" to permit the negotiation of financial assistance or purchase and sale agreement between the railroad and the prospective subsidizer. 1976 U.S.Code Cong. & Admin.News, *supra*, at 24.

In 1978 the Interstate Commerce Act was recodified by Congress. The language governing abandonment procedures appears in 49 U.S.C. §§ 10903–10909 (1982).

Under 49 U.S.C. § 10905, and whenever the ICC finds that the public convenience and necessity require or permit abandonment or discontinuance of a particular rail line, the ICC must publish its finding in the Federal Register, so as to afford a person who wishes to prevent the abandonment or discontinuance an opportunity either to purchase or subsidize the line for continued operation. 49 U.S.C. § 10905(c); *Hayfield N.R.R.*, 467 U.S. at 629, 104 S.Ct. at 2615. If an offer is forthcoming, the railroad and the offeror are granted an opportunity to negotiate an agreement. If an agreement is not reached, either party may request the ICC to set up the terms and conditions for the transaction. 49 U.S.C. § 10905(e). When the ICC sets up the term and conditions, the railroad is bound by them, but the offeror is not. 49 U.S.C. § 10905(f). The purpose of 49 U.S.C. § 10905 is to "accommodate the conflicting interests of railroads that desire to unburden them-

selves quickly of unprofitable lines and shippers that are dependent upon continued rail service." *Hayfield N.R.R.*, 467 U.S. at 630, 104 S.Ct. at 2615.

Congress amended 49 U.S.C. § 10904(b) in 1980 in order to make it easier for carriers to abandon their rail lines. The amendment provided that if no one filed a protest with the ICC within 30 days of filing an application for abandonment, then "the Commission shall find that the public convenience and necessity require or permit the abandonment or discontinuance.... Pub.L. No. 96–448, Title IV § 402(b), 94 Stat. 1895, 1941, 1942 (1980).

By 1983 Congress recognized that these measures "ha[d] not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes." H.R.Rep. No. 98–28 at 8 (1983) (hereinafter H.R.Rep.), U.S.Code Cong. & Admin.News 1983, p. 119; S.Rep. No. 98–1 at 9 (1983) (hereinafter S.Rep.) (same). Because the pre-existing federal law failed to deal adequately with the national problem of shrinking rail trackage, Congress enacted the National Trails System Act Amendments of 1983, Pub.L. No. 98–11, 97 Stat. 48 (codified at 16 U.S.C. § 1247(d)) (section 8(d) to the National Trails Act), which authorize the ICC to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails. Section 8(d) (codified at 16 U.S.C. § 1247(d)), provides that a railroad wishing to cease operations along a particular route may negotiate with a state, municipality, or private group prepared to assume financial and managerial responsibility for the right-of-way. If the parties reach agreement and subject to ICC-imposed terms and conditions, the land may be transferred to the trail operator for interim use notwithstanding whatever reversionary interests may exist in the property under state law. If no agreement is reached, the railroad may abandon the line entirely, thereby allowing the property to revert to abutting landowners if the terms of applicable easements and state law pro-

vide for such reversion. 49 C.F.R. § 1152.29 (1988). 16 U.S.C. § 1247(d) provides, in pertinent part:

> [S]uch interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

The stated congressional purposes of the amendments were (1) "to encourage the development of additional trails" and to "assist recreation[al] users by providing opportunities for trail use on an interim basis," H.R.Rep. at 8, 9, U.S.Code Cong. & Admin.News 1983, pp. 119, 120; S.Rep. at 9, 10 (same); *see also* 16 U.S.C. § 1241(a); and (2) "to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." H.R.Rep. at 8, U.S.Code Cong. & Admin.News 1983, p. 119; S.Rep. at 9; *see also* 16 U.S.C. § 1247(d). By deeming interim trail use to be a discontinuance rather than abandonment, Congress purposely prevented property interests from reverting under state law:

> The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trail use will be considered prior to abandonment....

H.R.Rep. at 8–9, U.S.Code Cong. & Admin.News 1983, pp. 119, 120; S.Rep. at 9.

When the ICC promulgated regulations under the 1983 amendments, the ICC explained the intentions behind enactment of § 1247(d) and its intended effect:

> d. Section 1247(d) preempts State laws that would otherwise result in extinguishment of easements for railroad purposes and reversion of rights-of-way to abutting landowners.
>
> . . . .
>
> ... [T]he main purpose of the amendment is to remove reversion as an obstacle that hinders or prevents the successful conversion of entire linear rights-of-way to recreational use when the rights-of-way have been operated under easements for railroad purposes....
>
> . . . .
>
> ... [P]reemption, the key feature of the amendment, applies only to rights-of-way held and operated under easements, or subject to rights of reversion....
>
> . . . .
>
> ... This language, and its legislative history, express congressional intent to preempt State property law that might otherwise require a reversion of rights-of-way upon the discontinuance or rail operations, as occurred in *Pollnow [v. State Dept. of Natural Resources*, 88 Wis.2d 350, 276 N.W.2d 738 (Wisc.1979) ] and *Schnabel [v. County of DuPage*, 101 Ill.App.3d 553, 57 Ill.Dec. 121, 428 N.E.2d 671 (Ill.1981) ], *supra*....

*Rail Abandonments—Use of Rights-of-Way as Trails*, 2 I.C.C.2d 591, 596, 597, 599, 600 (1986).[6] The ICC has stated that it will not consider whether trail use is feasible until after it finds "that the public convenience and necessity require or permit abandonment." *Id.* at 609. If trail use appears feasible, then the ICC will issue a notice or certificate of interim trail use ("NITU" or "CITU") in order to give the rail operator and trail operator 180 days to enter into a trail lease agreement. The NITU or CITU automatically becomes a

---

**6.** These rules are codified at 49 C.F.R. § 1152.29 (1988). Plaintiffs note that the United States Court of Appeals for the District of Columbia Circuit remanded the rules to the ICC, ordering the ICC to reconsider its statement that approval of a trail agreement could never effect a taking under the fifth amendment. *National Wildlife Federation v. ICC*, 850 F.2d 694, 705, 708 (D.C.Cir.1988). The ICC responded by stating that any property owner alleging a taking under section 1247(d) could seek relief in the Claims Court. 54 Fed Reg. 8,011 (1989).

certificate of abandonment should the rail carrier and trail operator be unable to reach an agreement within that time. 2 I.C.C.2d at 628; 49 C.F.R. § 1152.29(c)(1), (d)(1); *Preseault v. ICC*, 494 U.S. at 7 n. 5, 110 S.Ct. at 919 n. 5.

### 4. *History of the Preseault litigation*

The present litigation concerns three parcels adjoining the right-of-way: parcels A, B, and C. The initial conveyances in 1899 did not involve the plaintiffs. One conveyance, the result of a Commissioners' Award to the Barker Estate, became parcels A and B. The other conveyance was in the form of a warranty deed from the Manwells to the railroad and involved parcel C (also known as the Manwell parcel.)

In 1966 the Preseaults purchased the Manwell parcel from a previous owner, thereby acquiring whatever interests the Manwells had retained in the right-of-way after executing the deed to Rutland–Canadian Railroad in 1879. At present the Preseaults have a two-unit residence on the portion of the property between Lake Champlain and the railroad right-of-way and a 72–unit apartment complex on the portion of the property between the railroad right-of-way and the public street. The lakefront residence is reached via crossing through the right-of-way. The crossing was the subject of a 1976 written agreement between the Preseaults and Vermont Railway. In 1979 the Preseaults transferred parcel C to 985 Associates Ltd., a limited partnership of the Preseaults. In 1980 the Preseaults purchased parcels A and B and the Ireland parcel. In 1987 they sold parcel B and the Ireland parcel to a partnership consisting of themselves and Martin Lavin, who held title as of record. In 1988 Martin Lavin sold his interest to the Irelands. In 1990 the Irelands conveyed by quitclaim deed their interest in parcel B to 985 Associates. The Preseaults owned parcel A throughout.

In 1981 the Preseaults, who then owned parcels A and B and the Ireland parcel in their individual capacities, and some of their neighbors brought a quiet title action in the Superior Court of Chittenden County, Vermont, captioned *Trustees of the Diocese of Vermont, et al. v. State of Vermont, Vermont Railway, Inc., and City of Burlington*, alleging that the right-of-way had been abandoned both in fact and under Vermont law and that, therefore, the easement for railroad purposes had reverted to them by operation of Vermont property law. The former Manwell parcel was not involved in the case. *Preseault v. ICC*, 494 U.S. at 22, 110 S.Ct. at 927; *Trustees*, 145 Vt. at 512, 496 A.2d at 152. In August 1983 the superior court dismissed the action, holding that it lacked subject matter jurisdiction because the ICC had not authorized abandonment of the route and therefore still exercised valid jurisdiction over it. *Id.* Plaintiffs appealed the dismissal of their claim. The Vermont Supreme Court affirmed the dismissal, holding that "courts are not empowered to make any determination regarding the issue of abandonment, as such would interfere with the ICC's plenary authority in this area." 145 Vt. at 515, 496 A.2d at 154 (citations omitted).

On June 18, 1985, prior to ICC proceedings in this matter, the State of Vermont, together with Vermont Railway, leased, for a five-year term, a portion of the railroad right-of-way to the City of Burlington for use as a bicycle and pedestrian path. In this lease both the State and Vermont Railway reserved the right to terminate the lease upon six months' notice, to re-lay railroad tracks and resume railroad operations over the right-of-way, and to monitor any renovation or construction affecting the right-of-way. The lease prohibited the raising or lowering of the existing railroad grade without approval. In 1990 the lease was renewed for a second five-year term. The City of Burlington has the option of renewing the lease at the expiration of each term for up to a total of 30 years. The City pays a total rental price of 20 cents per year or $1.00 for every five years.

On July 15, 1985, the Preseaults and several neighbors filed a petition with the ICC for a determination of exemption from the jurisdiction of the ICC and for a certificate of abandonment of the rail line. Ver-

mont intervened in the ICC action and petitioned the ICC to permit Vermont Railway to discontinue rail service and to transfer the right-of-way to the City of Burlington for use as a public trail under section 8(d) of the National Trails Act, 16 U.S.C. § 1247(d). To comply with the ICC's procedural requirements, the State and Vermont Railway, the state's lessee, filed a Verified Notice of Exemption (Corrected) on December 16, 1985. In that document the State of Vermont and Vermont Railway certified that

> no local traffic has moved over the line for at least two years and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a State or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Commission or any U.S. District Court or has been decided in favor of the complainant within the two year period.

By a Notice of Exemption decided January 2, 1986, the ICC allowed Vermont Railway to discontinue service and approved the agreement between Vermont and the City of Burlington for interim trail use. The ICC's decision became effective on February 5, 1986. The Preseaults applied for a stay of this order, alleging that the exemption procedures failed to afford them the opportunity to present their case adequately. The Preseaults also made a request to rebut Vermont's evidence.

The Preseaults' motion for reconsideration and/or clarification of the order was denied on July 7, 1987. *Vermont—Discontinuance of Service Exemption—In Chittenden County, Vt.*, 3 I.C.C.2d 903 (1987). In its decision denying the requested relief, the ICC noted that the Preseaults had been afforded an opportunity to present evidence of their claim. Moreover, the ICC stated that there was no need for cross-examination or additional evidentiary proceedings since, at the time of the proceedings on the Notice of Exemption, no material facts were in dispute. The ICC also examined the Preseaults' claim that the railroad's removal of a portion of track

effectively extinguished the railroad's easement over the Preseaults' property. The ICC was not persuaded by this rationale:

> Indeed, the very purpose of the *Out of Service Lines* exemption was to lessen regulatory requirements for abandonment of lines over which there had been no service and no request for service for at least two years. If our jurisdiction could be terminated by *de facto* abandonment, then out of service lines could be abandoned without regulatory approval and the exemption would be unnecessary. Even if the track is physically removed, as here, neither the carrier's common carrier obligation or the agency's jurisdiction is terminated. The Commission can, and has on occasion, ordered carriers to restore such lines where there is a request for service.

3 I.C.C.2d at 907.

In addition to reasserting its jurisdiction and prerogative to determine what constituted abandonment, the ICC addressed directly the legislative history of the National Trails Act. The ICC noted that Congress "intended by enactment of the Trails Act to preserve [the ICC's] jurisdiction to protect railroad rights-of-way from title claims such as those of the [plaintiffs]." *Id.* The ICC declared that "[i]nevitably, interim trail use will conflict with the reversionary rights of adjacent land owners, but that is the very purpose of the Trails Act...." *Id.* at 908. The National Trails Act reflected the specific intent of Congress, asserted the ICC, to preempt state property law, which might ordinarily require a reversion of rights-of-way when railroad operation is discontinued. *Id.* The ICC declined to "make a finding that the right-of-way could or would be used for future rail use," remarking that "the Trails Act does not require such finding. The legislative history of the Trails Act, as well as its wording, shows that Congress did not intend to require a carrier to articulate a definite plan for resumption of rail service." *Id.* at 906 n. 6.

The Preseaults appealed the ICC's decision to the United States Court of Appeals for the Second Circuit. *Preseault v. ICC,*

853 F.2d 145 (2d Cir.1988), *aff'd on other grounds*, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). In its decision the Second Circuit addressed the two constitutional claims raised by the Preseaults: that the National Trails Act was not a valid exercise of congressional Commerce Clause power and that the National Trails Act was facially violative of the Takings Clause of the fifth amendment to the U.S. Constitution.

As to the Preseaults' Commerce Clause claim, the court noted that under the requisite rational basis analysis, the challenged section of the National Trails Act served two purposes: (1) the preservation of rail corridors for renewed railroad use and (2) the public recreational use of trails. 853 F.2d at 150. Concluding that the National Trails Act seemed "a remarkably efficient and sensible way" to further both goals, the court held that the National Trails Act was a valid exercise of Congress' power over interstate commerce. *Id.*

The court also rejected the Preseaults' fifth amendment claim that the National Trails Act constitutes a taking without just compensation. The court reaffirmed the ICC's jurisdiction and plenary power to issue certificates of abandonment. Although the Preseaults and appellee differed on their view of their respective property interests, the court ruled that even if the railroad had only an easement and the Preseaults retained reversionary rights in the easement, those reversionary rights were not triggered until the easement was abandoned. Without an ICC certificate of abandonment, there could be no abandonment, no reversionary rights triggered, and therefore no taking. *Id.* Thus, the court affirmed the decision of the ICC. The Preseaults then petitioned the United States Supreme Court for a *writ of certiorari*, which was granted.

In a unanimous decision, the Supreme Court affirmed the decision of the court of appeals on other grounds. *Preseault v. ICC,* 494 U.S. at 17, 19, 110 S.Ct. at 924, 925. The Court stated that it was unnecessary to evaluate the merits of plaintiffs' takings claim, holding that "even if the rails-to-trails statute gives rise to a taking, compensation is available to [plaintiffs] under the Tucker Act ..., and the requirements of the Fifth Amendment are satisfied...." 494 U.S. at 4–5, 110 S.Ct. at 918. Until they had attempted to avail themselves of the remedy supplied by the Tucker Act, the Preseaults' taking claim was premature. *Id.* at 17, 110 S.Ct. at 924. Although the Court declined to examine the property issues presented, the Court did affirm the Second Circuit's treatment of the Commerce Clause claim, holding that the National Trails Act was a valid exercise of congressional power under the Commerce Clause. *Id.* at 18, 110 S.Ct. at 924.

Following the execution of the lease, Burlington paved an eight-foot wide strip down the middle of the right-of-way across plaintiffs' land, approximately 60 feet from the Preseaults' residence. Burlington also drove two concrete posts, each 12 inches in diameter, and one metal post, 4.5 inches in diameter, into the path running across plaintiffs' property, in order to prevent automobile traffic from accessing the pedestrian and bicycle path. Burlington has also erected two stop signs along the right-of-way.

Plaintiffs have supplied affidavits that are unchallenged by defendants. According to the Second Affidavit of J. Paul Preseault dated June 3, 1992 ("Second Preseault Aff."), on warm, sunny weekends, approximately 200 people per hour pass through the Preseaults' property across the right-of-way. Second Preseault Aff. ¶ 6. On warm evenings during the week, approximately 100 people per hour pass. *Id.* People using the trail often enter the Preseaults' front yard in order to get a better view of Lake Champlain. *Id.* Individuals using the trail have collided with the Preseaults and members of their family. Third Affidavit of J. Paul Preseault dated July 15, 1992, ¶¶ 2–4 ("Third Preseault Aff.").

In 1987 the Preseaults moved some soil on the western edge of one of the easements as part of a construction project on some of the land unencumbered by the

easement.[7] The City of Burlington and the State of Vermont filed an action for trespass against the Preseaults in the Superior Court of Chittenden County. On February 7, 1992, the superior court granted partial summary judgment against the Preseaults, holding that the City and State have the exclusive right to occupy, use, and possess the right-of-way. *State v. Preseault*, No. S474–87 CnC (Chittenden Cty.Super. Ct. Feb. 7, 1992). The Preseaults moved for reconsideration, arguing that, as owners of the underlying fee, they were entitled to use the easements in ways that do not interfere with their present use as a recreational path. On July 15, 1992, the superior court issued an opinion and order affirming its earlier decision.

On December 26, 1990, plaintiffs filed a complaint in the Claims Court against the United States. Plaintiffs subsequently served a copy of the complaint on the State of Vermont, pursuant to RUSCC 14(a)(1). The State of Vermont entered its appearance as co-defendant on May 20, 1991. In their complaint plaintiffs ask this court to enter judgment against the United States and the State of Vermont for just compensation, plus interest, for the fair market value of the portion of plaintiffs' land which the United States has taken. Plaintiffs also ask this court to enter judgment against defendants for just compensation, plus interest, for the reduction in fair market value of portions of plaintiffs' land adjacent to the land taken by defendants. Finally, plaintiffs request an award of fees, costs, and any other relief, which this court deems proper, stemming from the alleged unlawful taking of plaintiffs' land.

As already noted, the court in its earlier opinion decided the question of what property interests were held by plaintiffs, applying Vermont common law alone. The court held:

As a matter of Vermont law, the conveyances of the real property were conveyances of easements and plaintiffs accordingly retained, as successors to the original grantors, reversionary rights in

these easements. Under Vermont law these easements were abandoned and extinguished. Under *Proctor [v. Central Vt. Pub. Serv. Corp.*, 116 Vt. 431, 77 A.2d 828 (1951)]* those easements were extinguished not later than removal of the tracks and equipment from the line in 1975. The court expresses no view on whether federal law has preempted plaintiffs' reversionary rights to the estates in fee underlying the extinguished easements. The parties will address this issue in the next phase of briefing....

*Preseault*, 24 Cl.Ct. at 836.

## DISCUSSION

 It is well established that a takings claim cannot succeed under the fifth amendment if a government action, although causing economic harm, "[does] not interfere with interests that ... [are] sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (citations omitted). Before a party can recover compensation under the fifth amendment for a taking, under either a physical invasion or regulatory taking theory, he must establish a compensable property interest. *Lucas v. South Carolina Coastal Council*, — U.S. —, — - —, 112 S.Ct. 2886, 2899–2900, 120 L.Ed.2d 798 (1992) (regulatory taking); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979) (taking by physical invasion). Applying this general premise, defendants assert that it is unreasonable for plaintiffs to have expected that their property interests would be unencumbered by ICC regulatory authority governing abandonments. Defendants note that the power of the ICC to regulate such authority is broad. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 319, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981). Defendants add that because Ver-

---

7. Plaintiffs note that the easements are much wider than the bicycle and pedestrian path. The easement across the Barker Estate (parcels

A and B) is approximately 148.5 feet wide. The easement across parcel C is approximately 82.5 feet wide.

mont law on railroad abandonments has developed consistently with the federal regulatory scheme promulgated by Congress acting through the ICC, a reasonable expectation that plaintiffs' reversionary interests would ripen in a manner inconsistent with federal law was not part of the title, or the interest, they acquired in the right-of-way at issue.

To the extent that plaintiffs claim a reversionary interest measured by common law rules notwithstanding ICC jurisdiction, defendants argue, plaintiffs have no compensable expectancy. Defendants note that from the early days of railroading, Vermont has attempted to harmonize its railroad policies with those governed by federal law. In 1886 the State created the Board of Railroad Commissioners, which was given broad supervisory powers over all railroads operated within Vermont. 1886 Vt. Acts No. 23. As quoted earlier, the Act committed the "railroad commissioners appointed under this act ... [to], as far as consistent with the laws of this State, conform to the laws of the general government, and the recommendations of the national board upon the subject of ... said acts and recommendations[.]" if Congress passed any acts dealing with interstate commerce. *Id.* § 12.

Defendants find this provision important as it demonstrates that Vermont, rather than contending with a federal regulatory system foisted upon it, sought early on to "embrace the federal system which began in 1887." Defs' Br. filed June 5, 1992, at 27.

Defendants correctly point out that since 1920, when Congress passed the Transportation Act of 1920, Vermont has not recognized common law abandonment. This is true insofar as Vermont does not recognize common law abandonment on rail lines within ICC jurisdiction. As of 1951 the doctrine of common law abandonment for rail lines outside ICC jurisdiction was still viable. See discussion of *Proctor v. Central Vt. Pub. Serv. Corp.*, 116 Vt. 431, 77 A.2d 828 (1951), in *Preseault*, 24 Cl.Ct. at 835–36. However, beginning with the passage of the Transportation Act, Vermont looked to the ICC for its determination of abandonment authority on lines within its jurisdiction.

The Superior Court of Chittenden County addressed this issue in *State v. Preseault,* No. S474–87 CnC (Chittenden Cty.Super.Ct. Feb. 7, 1992):

> The defendants attempt to draw a distinction between a "de facto" and "legal abandonment." We find no authority for such a distinction and hold that the ICC's authority to determine issues of abandonment is plenary.... The fact that the trackage was removed in 1975 eleven years prior to the State's application to discontinue service and convert the right of way to trail use is of no consequence.... In sum, a railroad right of way cannot be considered to be abandoned *at state law* unless the ICC has so ruled....

Slip op. at 8–9 (citations omitted; emphasis added).[8]

Because of the federal regulatory scheme in place at the time plaintiffs acquired title in their property, defendants conclude that plaintiffs' belief was ill-founded that any certification of abandonment of the railroad easement could occur absent action by the ICC. The ICC regulated both abandonment and discontinuance for almost 60 years before plaintiff 985 Associates acquired its interest in the Manwell parcel, 60 years before the individual plaintiffs acquired their interest in parcel A, and 70 years before plaintiff 985 Associates obtained a quitclaim deed to parcel B.

Plaintiffs argue that federal law has preempted Vermont law in two respects. First, the passage of the 1920 Transportation Act rendered Vermont common law on

---

**8.** Although the Superior Court of Chittenden County found no authority for the two distinct concepts of "de facto" and "legal" abandonment, the ICC itself has recognized these two definitions. *See Modern Handcraft, Inc.—Abandonment in Jackson Cty., Mo.*, 363 I.C.C. 969, 972 (1981) (in ruling whether to grant certificate of abandonment, ICC looked to facts of rail carrier's non-use of rail line, finding "no doubt that a de facto abandonment of the Freight Operation line has taken place").

abandonments of rail lines within ICC jurisdiction inoperative. Before Congress expanded the ICC's jurisdiction to include authority to certify abandonments, Vermont common law provided that non-use of a railroad easement, coupled with a visible manifestation of the intent to cease using the easement, such as removal of track, would cause extinguishment of the easement.[9] The second significant change in the law arose from the implementation of section 1247(d) of the 1983 amendments to the National Trails Act, permitting the ICC to authorize discontinuance of rail use in order to effect trail conversion, which, plaintiffs contend, the ICC had no power to implement prior to 1983. Before that date the ICC would have had to certify an abandonment in order to convert a railroad right-of-way to trail use. This would have resulted in the automatic reversion of their easements, according to plaintiffs. After 1983 the ICC was given a congressional mandate to postpone their reversionary interests, thereby preempting state law and subordinating these interests to the interest of trail operators and the general public, who had no cognizable legal interest in the rights-of-way prior to implementation of section 1247(d). Plaintiffs do not seek compensation based on the effect of the 1920 Transportation Act. They concede that, even if valid, this claim would be barred by the statute of limitations. Rather, plaintiffs frame their request for relief on the taking that they allege has resulted because of the enactment of section 1247(d) and its preemption of state law and their reversionary interests.

## I. THE NATURE OF PLAINTIFFS' PROPERTY INTERESTS

In *Lucas v. South Carolina Coastal Council*, — U.S. at —, 112 S.Ct. at 2886, the Supreme Court announced a standard for a *per se* confiscatory regulatory taking. The new rule is that a regulation depriving a landowner of all economically viable use of his property will be deemed a taking without regard to the public interest served, except when a nuisance or limita-

tion on title imposed by state law is involved. — U.S. at —, 112 S.Ct. at 2900. In *Lucas* the landowner acquired residential property to develop single-family homes in an area subject to state regulation of homesites by the South Carolina Coastal Council (the "Council"). Subsequent to plaintiff's purchases, state legislation directed the Council to establish an erosion line beyond which construction would not be permitted. The landowner's homesites were seaward that line. The Court focused on the landowner's expectations as of the date on which he acquired his interests. A state may resist compensating property owners for burdensome regulation

> only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property....

— U.S. at —, 112 S.Ct. at 2899 (footnote omitted). The Supreme Court observed the argument of the South Carolina Coastal Council that it was entitled to regulate all use out of the plaintiff's property and

> that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings clause that has become part of our constitutional culture.

*Id.* at —, 112 S.Ct. at 2900 (footnote omitted).

■ Plaintiffs in this case took title in fee simple. Their titles were subject to easements. A reversionary interest was the specific property interest alleged to have been taken by postponement in 1986 when the ICC rejected the Preseaults' petition for a certificate of abandonment and approved discontinuance subject to lease of the right-of-way for interim trail use. A

---

9. See discussion of the doctrine of "non-use" plus" in *Preseault*, 24 Cl.Ct. at 832.

reversionary interest constitutes property within the meaning of the fifth amendment. *National Wildlife Federation v. ICC*, 850 F.2d 694, 704 (D.C.Cir.1988).

██ *Lucas* teaches that the historically rooted expectancy, or the "bundle of rights" one acquires as a property owner, is measured at the time when one takes title to property. —— U.S. at ——, 112 S.Ct. at 2899. Limitations that severely burden land use "cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership...." *Id.* at ——, 112 S.Ct. at 2900. The import of *Lucas* to the instant case is that it fixes the date on which the claimant acquires his interest for determining whether he possesses a compensable property interest. Although the case involved a regulatory taking—one that affected the use of property—*Lucas'* approach to ascertaining whether a compensable property interest is present applies to cases involving regulation that causes or authorizes a physical invasion. At ——, 112 S.Ct. at 2893; *see also Loretto v. Teleprompter Manhattan CATV Corp.* 458 U.S. 419, 438–41, 102 S.Ct. 3164, 3177–79, 73 L.Ed.2d 868 (1982) (state statute requiring landlord to permit installation of cable television facilities on her property at a rate fixed by state constitutes permanent physical occupation for which owner entertains a historically rooted expectation of compensation); *California Housing Sec., Inc. v. United States*, 959 F.2d 955, 958 (Fed.Cir.1992) (federal regulator's seizure of savings and loan did not constitute a physical taking because neither institution nor its owner could have developed historically rooted expectation of compensation for such seizure).[10]

The following timeline depicts the interplay between the significant regulatory events and plaintiffs' acquisition of their properties:

---

1886 Vermont Board of Railway Commissioners established

1887 Interstate Commerce Act creates ICC

1899 Easement taken in Barker Estate (parcels A and B) and Manwell property (parcel C) for Rutland–Canadian Railroad

1920 Interstate Commerce Act amended to give ICC authority for abandonment or discontinuance of rail service based on public convenience and necessity

1962 ICC authorizes abandonment of Rutland–Canadian line

1963 Vermont passes "An Act Relating to the Rutland Railway Corp." to preserve for continued railroad service so much of the line Rutland abandons as may be feasible in the event of abandonment of such service

1964 Vermont purchases Rutland Railway trackage and leases to Vermont Railway

1966 Preseaults purchase Manwell property (parcel C)

1968 National Trails System Act

1970 Vermont Railway ceases active transportation on line

1974 Regional Rail Reorganization Act (3–R Act)

1975 Railway equipment removed from line

1976 Railroad Revitalization and Regulatory Reform Act (4–R Act) allowing ICC to dispose of abandoned lines for "public purpose," including trail use

1979 Preseaults transfer Manwell parcel to 985 Associates

1980 Preseaults purchase parcels A and B; 49 U.S.C. § 10904(b) expedited abandonment by authorizing ICC to permit abandonment or discontinue if no one files a protest within 30 days of a filing for abandonment or discontinuance

1981 Preseaults bring quiet title action

1983 National Trails System Act amendments; section 1247(d) preempts reversionary rights

---

10. The Federal Circuit fixed the inquiry at the time of the seizure. *Lucas* pinpoints the date of acquisition as critical.

June 18, 1985 State of Vermont and Vermont Railway lease easement to City of Burlington for use as a bike path

July 15, 1985 Preseaults file for exemption from ICC jurisdiction and for certification of abandonment; Vermont intervenes

Jan. 2, 1986 ICC allows discontinuance of line subject to the agreement between City of Burlington and Vermont

1987 Preseaults sell parcel B to partnership consisting of themselves and Lavin; Preseaults also move some soil on the western edge of easement; Burlington and Vermont file trespass action

1988 Lavin sells interest to Irelands

1990 Irelands convey interest to 985 Associates

Feb. 7, 1992 Superior Court grants summary judgment for plaintiffs in state trespass action, holding that Vermont and Burlington have exclusive right to use of land

The parties have stipulated that in 1966 the Preseaults purchased parcel C, or the Manwell parcel, from a previous owner. In 1979 they transferred the Manwell parcel to plaintiff 985 Associates, the limited partnership consisting of themselves. In 1980 the Preseaults purchased parcels A and B and the Ireland parcel. In 1987 they sold parcel B and the Ireland parcel to a partnership consisting of themselves and Martin Lavin, who held title as of record. In 1990 the Irelands, who had purchased his interest in parcel B and the Ireland parcel from Martin Lavin in 1988, conveyed their interest in parcel B by quitclaim deed to plaintiff 985 Associates. The ownership and critical dates can be summarized, as follows:

| Parcel | Date Acquired | Owner [11] |
| --- | --- | --- |
| Parcel C (Manwell) | 1979 | 985 Associates |
| Parcel A | 1980 | Preseaults |
| Parcel B | 1990 | 985 Associates |

*Lucas* rejects plaintiffs' position that their property rights are to be measured by the fee interests burdened by the railroad right-of-way as a servitude, which interests were conveyed in 1899. The Supreme Court in *Lucas* did not advocate examining the property owner's title and the bundle of rights he acquired by turning back all the way to the time when the land was first conveyed by the owner's predecessors in interest. The Court looked, instead, at those limitations on his ownership interests as of the date on which he acquired the property. Thus, the relevant date for determining plaintiffs' historically rooted expectancies should not be that on which the parcels were conveyed by plaintiffs' predecessors in interest, but, rather, the dates on which plaintiffs themselves acquired title to their properties.

Plaintiffs argue that under *Lucas* the inquiry is addressed to state law, which would include the easements created in 1899, but not federal ICC law. The Court in *Lucas* referred to its "traditional resort to 'existing rules or understandings that stem from an independent source such as state law' to define the range of interests that qualify for protection as 'property' under the Fifth (and Fourteenth) amendments." *Lucas*, —— U.S. at ——, 112 S.Ct. at 2901 (citing, *inter alia, Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). The Court also employed in the same context the phase, "the relevant background principles." *Lucas*, —— U.S. at ——, 112 S.Ct. at 2901. Since *Lucas* did not involve a taking by the Federal Government, the narrow language used concerning state law was appropriate to the scope of the decision. However, the Court recognized a federal navigational servitude as an example of a pre-existing limitation on a landowner's title: "[W]e assuredly *would* permit the government to assert a permanent easement that was a pre-existing limi-

11. Although the Preseaults as individuals comprise plaintiff 985 Associates, ignoring the separate limited partnership entity in order to homogenize the property owners' expectations is unjustified. Individuals undertake to establish separate legal entities for doing business to garner favorable consequences under federal and state tax and corporate law. The voluntary legal arrangements cannot be invoked for one purpose and disregarded for another. At least, no party has advocated a principled reason for doing so. Nor can the property transfers be deemed ministerial, matters of form, or otherwise irrelevant to a takings analysis.

tation upon the landowner's title...." At ——, 112 S.Ct. at 2900 (emphasis in original) (citing *Scranton v. Wheeler*, 179 U.S. 141, 163, 21 S.Ct. 48, 57, 45 L.Ed. 126 (1900)). Consequently, the Court did not restrict its approach to limitations on title imposed by state law.

■ It is true that *Lucas* acknowledged only limitations that inhere in one's title, be they state or federal, as well as limitations imposed by state property and nuisance law. A question of first impression therefore is presented by this case—whether, given long-standing, pervasive, and specific federal limitations on rights created by state law in respect of property burdened by a private easement for a public purpose, a landowner could have developed a historically rooted expectation of compensation for postponement of those rights when state law does not recognize the rights independent of federal regulation. The court rules in the negative.

Arguing that the relevant events defining plaintiffs' historically rooted expectations should be the Transportation Act of 1920 and the ICC's power to regulate abandonments, defendants cite *Louisville & Nashville Railroad v. Mottley*, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911), to demonstrate the Supreme Court's axiom that in doing business with railroads, one is to understand that Congress, operating under its Commerce Clause powers, may make changes in applicable law. In *Louisville & Nashville Railroad*, the Supreme Court addressed the validity of a contract providing for free annual passage aboard the railroad that resulted from a personal injury settlement. The Court found that the while the contract may have been valid under state law, when Congress created a law providing that carriers shall not provide free tickets to any passengers, except those specifically exempted from the regulation, the preexisting contract was no longer valid. The Court noted:

> The agreement between the railroad company and the ... [plaintiffs] must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so ex-

ert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value.

*Id.* at 482, 31 S.Ct. at 270. Given the pervasive federal regulation of railroads, defendants assert that "plaintiffs' claim in this case to a property right in a reversion under early common law (unaffected by ICC jurisdiction) is without judicial support." Defs' Br. filed June 5, 1992, at 34.

In contrast to the case at bar, *Louisville & Nashville Railroad* was brought as a constitutional challenge to the Commerce Clause power of Congress. That issue already has been resolved with respect to the Preseaults. In *Preseault v. ICC*, the Supreme Court held that passage of section 1247(d) was a valid exercise of Congress' power under the Commerce clause. 494 U.S. at 17–19, 110 S.Ct. at 924–26. In addition, the Court in *Louisville & Nashville Railroad* addressed other cases dealing with the power of Congress to regulate Commerce under the Constitution, noting that these powers were not without limit. In analyzing these cases, the Supreme Court remarked "that the power granted to Congress to regulate commerce among the States ... is complete in itself, and is unrestricted except by the limitations upon its authority to be found in the Constitution...." *Id.*, 219 U.S. at 480, 31 S.Ct. at 269 (citations omitted).

One of the cases examined by the Court was *Scranton v. Wheeler*, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126 (1900). In *Scranton* a riparian land owner sought compensation from the Government for a fifth amendment taking after the Government obstructed his access to navigable waters by constructing a pier on the submerged grounds in front of his land. Ruling that no compensation was warranted, the Court concluded that the Government's purpose in constructing the obstructing pier was simply the improvement of the public waters of the United States, rather than the abrogation of specific property rights. 179 U.S. at 164–65, 21 S.Ct. at 57–58. The *Louisville & Nashville Railroad* Court distilled the same lesson from *Scranton*, de-

claring that the Government in that case "had no object in view except, in the interest of the public, to improve navigation." *Louisville & N.R.R.*, 219 U.S. at 481, 31 S.Ct. at 270. The Court specifically noted that the actions of the Government in constructing the pier in *Scranton* were not designed to abrogate any property owner's property rights. *Id.*

On this basis *Scranton* is distinguishable from the case at bar. It is undisputed that the sole purpose in enacting section 1247(d) was to frustrate the reversionary interest of owners of the fee underlying railroad easements, which interest would become present possessory the instant the ICC certified abandonment under the 4–R Act. The promulgation of section 1247(d) occurred when Congress realized that implementing its trail conversion program would be dropped in those states with strict property laws providing for reversion upon conversion to trail use. The intent of section 1247(d) was to preempt those same state laws. As the ICC noted, "[i]nevitably, interim trail use will conflict with the reversionary rights of adjacent land owners, but that is the very purpose of the Trails Act...." *Vermont—Discontinuance of Service Exemption—In Chittenden Cty., Vt.*, 3 I.C.C.2d 903, 908 (1987) (citation omitted).

In *Lucas* Justice Stevens suggested that one might "loo[k] to the *generality* of a regulation of property" to determine whether compensation is due under the fifth amendment. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2923 (Stevens, J. dissenting) (emphasis in original). This method of examining property interests was rejected by the Supreme Court in favor of the bright-line test which would have the only relevant expectancies be those firmly rooted in law on the date of the acquisition of property. At ——, 112 S.Ct. at 2899. As a consequence the court rejects defendant's argument that plaintiffs' reasonable expectancies regarding their property interests were circumscribed by the ICC's plenary authority to regulate abandonments as of 1920, even though that authority was exercised in 1962 in respect of the subject easements. The conversion to trails, with the

attendant postponement of the ripening of reversionary interests, had to be in the picture in order to circumscribe a compensable property interest at the date of acquisition; general regulatory authority is insufficient.

This case illustrates one of three models for protection of private rights against uncompensated government usurpations. In the first, the classic model, a property owner acquires his interest before the state or federal government issues a regulation subjecting it to intrusion by the public. In the second, which Justice O'Connor posited, the property is acquired against a backdrop of federal regulation, and a specific federal law preempts state law in determining how the state-created property rights operate. Both the first and second models are static. The third is dynamic. In this model, exemplified by the case at bar, both federal regulation changes and property interests shift. The property owner is buying and selling or transferring his interest as the federal law ever more circumscribes that interest. Property rights have been created under state law in this model, but the state courts for years have not applied state law as a source independent of federal law in interpreting these rights.

The law is not an abstract concept removed from the society that it serves. The Constitution both protects the interests of property owners and provides for the broad public good. Plaintiffs acquired through purchase or transfer land that had been taken in the past in order to preserve it for railroad use. The 4–R Act was enacted because Congress was concerned about railroad rights-of-way falling out of the public domain. Plaintiffs bought burdened properties and did so with expectations historically rooted in the evolving federal law regulating abandonments of railroads and the state law which operated companionably with federal law. They repeatedly sold or transferred their interests in these properties from 1979 to 1990, during which period federal laws impacted the conditions under which their reversionary interests could be expected to ripen. The *Lucas* bright-line test stops the musical chair

shifting identity of property owners and fixes the date of injury as the most recent purchase or transfer. In this dynamic model, it cannot be said that plaintiffs had compensable property interests by the dates of the most recent purchase or transfer of each parcel.

## II. TAKING OF EASEMENT BY PHYSICAL INVASION

Plaintiffs argue that the Government has effected a taking by a permanent physical invasion in the nature of an easement. "[E]ven if the Government physically invades only an easement in property, it must nonetheless pay compensation...." *Kaiser Aetna,* 444 U.S. at 180, 100 S.Ct. at 393 (citing *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (physical invasion of airspace over landowner's property by intermittent entry of government planes amounted to a taking), and *Portsmouth Harbor Land & Hotel Co. v. United States,* 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922) (taking accomplished by intermittent firing of artillery shells over land)). None of these cases, however, involves a preexisting easement; rather they deal with the creation of an easement in the first instance. The distinction is of moment, not only because the preexisting easements are at the heart of plaintiffs' reasonable expectations concerning the nature of their property interests, but because the preexisting easements in this case allowed a physical invasion and were subject to regulation by the ICC.[12]

Plaintiffs find *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), on point. The landowner's property was near an airport; the path of the glide to the runway passed directly over the property. The Government leased the airport during World War II, and the military aircraft created such noise as to shut down plaintiff's chicken business. The Supreme Court upheld the finding that an easement

had been taken (whether permanent or temporary was to be determined on remand), although the public had a right to travel in the navigable air space above plaintiff's land. The case did not involve a preexisting burden, however, since the Court took pains to demarcate the landowner's "exclusive control of the immediate reaches of the enveloping atmosphere." 328 U.S. at 264, 66 S.Ct. at 1067. Similarly, *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and *Kaiser–Aetna,* 444 U.S. 164, 100 S.Ct. 383, involved, respectively, the California Coastal Commission's conditioning of a building permit on the landowner's agreeing to an easement for the public to pass across a portion of his property and the Army Corps of Engineers' insisting that the landowners grant the public access to a pond that they had improved by connecting it to the ocean because the pond had become a navigable water of the United States as a result of the improvements. Although both cases dealt with construction subject to state or federal regulation, neither property interest was burdened by a preexisting easement.

In *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991), the Federal Circuit found a taking by a regulation under which the EPA issued an order giving itself and the State of California authority to enter plaintiff's land to test ground water for pollution and to return as often as they pleased to continue this monitoring. The Federal Circuit ruled that easements are property interests capable of being "taken" when the Government acts as if it had acquired an easement and "at its convenience" sends its employees on the landowner's property. 952 F.2d at 1376, 1378. Although the backdrop of EPA regulation was extensive, the landowner's property was not subject to a preexisting easement that itself was subject to regulation by the EPA.

12. Defendants argue that the analysis applicable to regulatory takings is the correct approach. Since section 1247(d) effects a suspension of plaintiffs' reversionary interests, this argument is not insubstantial. For purposes of its analy- sis, however, the court deems the alleged taking to be physical, consistent with the precedents dealing with easements. The result would be the same if a regulatory takings analysis were employed.

If plaintiffs possessed compensable property interests at the time the ICC conditioned discontinuance on the lease for trail operation, thereby postponing the ripening of their reversionary interests, plaintiffs could claim under established case law that a federal regulation had allowed strangers to invade their properties and thus had taken an easement by physical invasion. The easement cases are instructive only insofar as they help identify the type of taking issue. They do not elucidate whether plaintiffs possessed compensable property interests in this case.

## III. THE EFFECT OF THE REGULATORY FRAMEWORK AS OF 1979, WHEN THE FIRST PARCEL WAS ACQUIRED, ON PLAINTIFFS' PROPERTY INTERESTS

Section 1247(d)'s preemption of state property laws is suggestive that the 1983 amendments to the National Trails Act, not merely the 1976 4–R Act, should mark the date critical to assessing plaintiffs' expectancies. In *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1012, 104 S.Ct. 2862, 2877, 81 L.Ed.2d 815 (1984), the Supreme Court rejected the argument that a federal law requiring registration of trade secrets with the Environmental Protection Agency did not work a taking since the law only had the effect of preempting rights in trade secrets under state property law. Although the cases share the similarity that the legislation (the 1983 amendments to the National Trails Act, in this case) was intended to apply uniformly irrespective of state law, the crucial difference is not how the legislative action operated, but the nature of the property interests involved.

Monsanto owned its trade secrets outright; plaintiffs in this case own property encumbered by railroad easements. Monsanto confronted an act that confiscated its trade secrets previously not subject to this form of limitation. As of 1976 plaintiffs took their property subject to railroad easements regulated by the ICC, and the ICC was authorized to defer issuing a certificate of abandonment—not indefinitely—while the right-of-way was offered for railbanking and trail conversion.

In her concurring opinion in *Preseault v. ICC,* 494 U.S. at 20, 110 S.Ct. at 926, Justice O'Connor applied the principle stated in *Ruckelshaus* to the Preseaults' claim and concluded that a taking by preemption under section 1247(d) would require compensation under the fifth amendment, since the ICC's delaying plaintiffs' enjoyment of their reversionary interests burdens and defeats them and does not only suspend the vesting of these interests. "Any other conclusion would convert the ICC's power to preempt conflicting state regulation of interstate commerce into the power to preempt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment...." *Preseault v. ICC,* 494 U.S. at 22, 110 S.Ct. at 927 (citation omitted) (O'Connor, J., concurring).[13] *Lucas* recognized the antecedent inquiry of ascertaining the property owner's legitimate expectations in light of the limitations in his title. The issue becomes whether plaintiffs' property rights were so circumscribed as of the time they acquired them that they had no reasonable expectation of obtaining a reversion by operation of state law.[14]

**13.** Justice O'Connor cited the Vermont Supreme Court's opinion in *Trustees of the Diocese v. State,* 145 Vt. 510, 496 A.2d 151 (1985), wherein the court flatly stated that Vermont State law on reversionary interests had been preempted. The preemption discussed occurred as long ago as the 1920's.

**14.** The court has ruled that the easement was abandoned under Vermont law apart from the effect of the ICC's authority to regulate abandonments and the relationship of state and federal law. *Preseault,* 24 Cl.Ct. at 830–36. In the first round of briefing, the question was posed

in a vacuum and answered in that fashion. However, the reality is that the question cannot be resolved satisfactorily without regard to federal and Vermont law dealing with railroads. A state (or federal) regulation can define the scope of a property interest, such that a restriction on use can inhere in the bundle of rights that an individual acquires when he takes title to property. In this case Vermont vigorously has disclaimed any role of state common law independent of the ICC's regulation of abandonments. The extension of the easements burdening plaintiffs' fee interests did not revive extinguished reversionary interests, because there was no via-

Plaintiffs acquired property subject to easements for a railroad right-of-way. Plaintiffs' predecessors in interest were forced through eminent domain proceedings to convey these easements to the railroad. They were forced to submit to the physical occupation by the railroad that was to operate for railroad purposes under Vermont law. The 4–R Act and the 1983 amendments to the National Trails Act have not expanded or changed the right-of-way. The easement is subject to a different, governmentally-sanctioned use that is compatible with preservation and resumption of rail traffic.

As of 1979, when plaintiff 985 Associates acquired the Manwell parcel and 1980, when the Preseaults acquired parcel A, plaintiffs took their interests subject to the ICC's ability wholly to regulate abandonment and discontinuance of service on the railroad easement. Moreover, the 1976 4–R Act provided for conversion of abandoned railroad rights-of-way to trails. As of 1990, when plaintiff 985 Associates acquired its interest in parcel B, section 1247(d) of the 1983 amendments to the National Trails Act had forestalled the ripening of revisionary interests. As to parcels A and C, since 1976 the laws providing for railbanking and trail conversion delimited plaintiffs' reasonable expectations concerning their after-acquired property, such that they reasonably could not expect that their reversionary interests would not be postponed. The same reasoning applies to parcel B, acquired in 1990.

Under the 4–R Act, the ICC's authority to regulate abandonment of railroad easements was not without limitation. The ICC could make findings to determine if the railroad line was a suitable candidate for a certificate of abandonment, but, as both plaintiffs and defendants have pointed out, the ICC could not act arbitrarily to forestall abandonment. Defendants recognize:

> The requirement that authority to abandon be obtained does not mean, however, that a railroad carrier can arbitrarily block other uses of the property. Any person establishing a "proper interest" in an abandonment proposal may seek the issuance of a certificate of public convenience and necessity authorizing the abandonment of the rail line. *Thompson v. Texas Mexican Ry. Co.*, [328 U.S. 134, 145, 66 S.Ct. 937, 944, 90 L.Ed. 1132 (1946)]; *Modern Handcraft, Inc.*, 363 I.C.C. at 971 (1981). An adjacent landowner claiming a reversionary interest in abandoned railroad property, among others, could establish such a proper interest. *Id.*

Defs' Br. filed June 5, 1992, at 5–6. *See generally National Wildlife Federation*, 850 F.2d at 702–08 (citing state law cases to the effect that conversion from rail to trail use constituted abandonment of right-of-way). The ICC could not implement a rail conversion without first certifying that a rail line had been abandoned under the 4–R Act. Plaintiffs repeatedly make the point that were such an abandonment to have been certified under law prior to 1983, plaintiffs would have been entitled to their reversionary interests.

Prior to the passage of section 1247(d), if the requisite findings were made, the ICC eventually would have had to certify abandonment. Under the law passed in 1983, subsequent to plaintiffs' acquisition of parcels C and A, the ICC was required to put the interests of trail operators and the general public ahead of the reversionary interests of all landowners asserting otherwise proper reversionary interests under state law. In other words, while plaintiffs took the property subject to the ICC's abandonment authority, as part of their bundle of rights, section 1247(d) would have operated to alter the method by which they would enjoy their reversionary interests if state

---

ble state law recognizing the extinction of the easements to be preempted. For 70 years Vermont has applied the ICC law on abandonments. Neither the 4–R Act nor the 1983 amendments to the National Trails Act changed existing state law. Indeed, this court's *in vacuo* ruling relied on a case decided in 1951 as the most recent state law. *Preseault*, 24 Cl.Ct. at 835–36. *Proctor v. Vermont Public Service Corp.*, 116 Vt. 431, 77 A.2d 828 (1951), is not controlling precedent on abandonment of railways under Vermont law; it dealt with an electric street railroad carrier not under the ICC's jurisdiction.

law would have recognized abandonment of the easements. Respecting Vermont, section 1247(d) was superfluous because Vermont does not recognize common-law abandonment of easements subject to ICC jurisdiction.

The court's holding that plaintiffs' expectations should be based on the federal and state law as of 1976 avoids making an unsubstantiated and unrealistic distinction between providing an elaborate and pervasive framework for trail conversion (the 4–R Act) and specific authority that could preempt reversionary interests that might frustrate conversion (section 1247(d)). As of 1979 the expectations that were firmly rooted in law included the 4–R Act and its institution of trail conversion. The 4–R Act authorized the ICC to implement a program of converting abandoned rails to trails as a form of railbanking. Congress extended financial assistance to states to purchase abandoned rail property and to convert abandoned rights-of-way to nonrailroad uses. The 4–R Act provided the ICC with authority to determine whether rail properties slated for abandonment or discontinuance "are suitable for public purposes," including national trails. § 809(b)(3), 90 Stat. 145; *see* 49 U.S.C. § 10906 (and note following). If the properties proposed for abandonment are deemed suitable for public purposes, "the properties may be sold, leased, exchanged, or otherwise disposed of only under conditions provided in the order of the Commission...." *Id.* Significantly, this litany of railroad property disposal actions would occur prior to the official certificate of abandonment.

All the property interests involved in this case were acquired after passage of this legal framework. Although the ICC could not defer issuing a certificate of abandonment indefinitely, the ripening of plaintiffs' interests depended on an incongruous series of events: (1) an ICC finding that the rail property was not suitable for public use; or (2) no one willing to buy, lease, or exchange for the rail property; and (3) no

other way to dispose of the property. Moreover, plaintiffs acquired their interests between 1979 and 1990 against a backdrop of state law that for years would not have recognized ripening of a reversionary interest in a railroad easement without issuance of a certificate of abandonment. Although plaintiffs' reversionary interests could have ripened had no trail operator presented itself, the ICC would not have issued an unconditional certificate of abandonment had one been on the scene. Plaintiffs' argument that this interest would have reverted automatically by operation of law before the 1983 amendments and section 1247(d) is frustrated by the 4–R Act's detailed provisions for prereversionary disposal of public purpose railroad properties and the deferential law of Vermont.

Thus, even before Congress enacted section 1247(d), plaintiffs had no reasonable expectation that their property interests would not be subject to a continuing railroad easement for the purpose of railbanking and use as a trail. Plaintiffs acquired heavily burdened property interests—land subject to use by scheduled trains.[15] These easements had been "taken" from plaintiffs' predecessors in interest by a form of eminent domain dating from 1899. The nature of the encumbrance remained the same; the use to which the easements were put, evolving from railroading to railbanking, is consistent with preserving the easements for rail use.

## IV. PLAINTIFFS' REASONABLE INVESTMENT–BACKED EXPECTATIONS

■ Assuming, *arguendo*, that plaintiffs had a compensable property interest in the ripening of their reversionary interests under Vermont law apart from Vermont law applicable to railroad easements, plaintiffs still would not prevail on a claim for a compensation under the fifth amendment.

---

15. In fact, as this court found in *Preseault*, 24 Cl.Ct. at 822, the easement had been abandoned by 1975. However, plaintiffs' expectations are not judged by the status quo of their property at the time of acquisition, but, rather, by the limitations on their interests when they took title.

Unless a taking is deemed *per se,* the court examines three factors set out in *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, to ascertain if public action works a taking. The Supreme Court has identified two *per se* takings. The first is a permanent physical occupation, *Loretto,* 458 U.S. at 432, 434–35, 441, 102 S.Ct. at 3174, 3175, 3179; the second is a confiscatory regulatory taking, or one that deprives property of all economically beneficial use. *Lucas,* —— U.S. at ——–——, 112 S.Ct. at 2899–2900.

The *Penn Central* approach applies in this case because any taking would not be deemed permanent. Each lease is for five years up to a maximum renewal period of 30 years, and a request to reactivate railroad operations can be made at any time. *Cf. Glosemeyer v. Missouri–Kan.–Tex. R.R.,* 685 F.Supp. 1108 (E.D.Mo.1988) (claim that section 1247(d) constitutes a temporary regulatory taking).

The Supreme Court in *Yee v. City of Escondido,* —— U.S. ——, ——, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992), suggested that the *Penn Central* analysis applies only to mere regulation of use of property, in contrast to government authorization of a physical occupation of property. Nonetheless, the Court has applied the *Penn Central* analysis to cases involving government authorized occupation of a non-permanent nature:

> The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical *invasion* is a taking. As *PruneYard Shopping Center v. Robins,* 447 U.S. 74 [100 S.Ct. 2035, 64 L.Ed.2d 741] (1980), *Kaiser Aetna v. United States,* 444 U.S. 164 [100 S.Ct. 383, 62 L.Ed.2d 332] (1979), and the intermittent flooding cases reveal, such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident; they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

*Loretto,* 458 U.S. at 435 n. 12, 102 S.Ct. at 3176 n. 12 (emphasis in original). There-

fore, the following factors should be considered in furtherance of an ad hoc inquiry: the character of the government action; the extent to which the regulation interferes with reasonable investment-backed expectations; and the economic impact of the government action.

The character of the government action would be a physical occupation authorized by federal law, *i.e.,* the 1976 4–R Act and the 1983 amendments to the National Trails Act require plaintiffs to submit to the physical occupation of their land. *See Yee,* —— U.S. at ——, 112 S.Ct. at 1528; *Loretto,* 458 U.S. at 433 n. 9, 102 S.Ct. at 3174 n. 9.

The second factor, plaintiffs' reasonable investment-backed expectations, is problematic for plaintiffs. Plaintiffs acquired their respective interests in the Manwell parcel and parcels A and B subject to railroad easements in 1979, 1980, and 1990, respectively, after enactment of the 1976 4–R Act that provided for railbanking, specifically the conversion of abandoned railroad rights-of-way to recreational trails, and authorized the ICC to delay issuance of a certificate of abandonment for up to 180 days in order to find a trail operator. The interests were acquired against long-standing regulation by the ICC of all railroad abandonments and well-established Vermont law that deferred to the ICC in respect of abandonment determinations. Plaintiffs hardly can argue that their reasonable investment-backed expectations were disturbed when the ICC acted to suspend their reversionary interests in a manner authorized by federal and state law in effect when they acquired their property. *See Ruckelshaus,* 467 U.S. at 1006–07, 104 S.Ct. at 2874–75 (pesticide manufacturer had no reasonable investment-backed expectation that agency would not use or disclose its propriety data in a manner that was authorized by law when submitted to the agency). The analysis that compels a finding that plaintiffs' lacked a historically-rooted expectation of compensability in this case also defines plaintiffs' reasonable expectations of economic use. *See American Continental Corp. v. United States,* 22 Cl.Ct. 692 (1991) (savings and loan share-

holders' reasonable investment-backed expectations unaffected by appointment of conservator and receiver pursuant to federal statute).

Since plaintiffs would have been unable to prove the requisite frustration of reasonable investment-backed expectations, the court need not examine the third factor, economic impact. *See Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. at 2874 (one factor may be determinative).

### CONCLUSION

Accordingly, based on the foregoing, plaintiffs' second motion for partial summary judgment is denied, and defendants' second cross-motion for summary judgment is granted. The Clerk of the Court shall enter judgment dismissing the complaint.

IT IS SO ORDERED.

